JAMES M. MINTON, dba MINTON FENCE SALES, Plaintiff in
Error,

*v.*

DOUGLAS STEVE LEONARD, Defendant in Error.

412 S.W.2d 886.

(*Knoxville,* September Term, 1966.)

Opinion filed February 17, 1967.

Gore, Gore & Ladd, Bristol, for plaintiff in error.

Slaughter & Jackson, Bristol, for defendant in error.

Mr. Justice Creson delivered the opinion of the Court.

This appeal comes from the Chancery Court of Sullivan County, Tennessee.

The parties will be referred to herein as they appeared in the trial court; that is, plaintiff in error James M. Minton, dba Minton Fence Sales, as defendant and defendant in error, Douglas Steve Leonard, as petitioner.

On November 3, 1965, the petitioner filed his petition for workmen's compensation. In the petition it was alleged that on May 1, 1965, while in the course and scope of his employment, the petitioner was injured when a section of pipe fell upon his back while he was engaged

in the erection of a backstop at an athletic field. It was further alleged that this injury permanently affected his ability to follow gainful employment. The petitioner prayed for an award of permanent partial disability under this State's Workmen's Compensation law.

The defendant's answer, filed on November 23, 1965, admitted that the petitioner received the injury alleged in his petition in the course and scope of his employment, but denied that, as a result thereof, he suffered any permanent partial disability.

On February 2, 1966, after the taking of the deposition of Dr. E. T. Pearson, the petitioner amended his petition, by adding the following:

"The petitioner further avers that on May 6, 1965 the traumatic experience he suffered aggravated a preexisting nervous condition causing nervous overlay which renders the petitioner totally and permanently disabled."

The trial court, on February 8, 1966, allowed the amendment. It was further ordered by the Court, upon motion of defendant, that a psychiatrist be appointed to examine the petitioner and to file report with the attorneys for both sides. The testimony of such psychiatrist was never made a part of the record by either side. The case was heard on June 20, 1966. The trial court found that the petitioner had suffered a fifty per cent permanent partial disability, and entered judgment that he recover for same from the defendant. Appeal has been timely perfected to this Court.

The assignments of error of defendant are as follows:

"ASSIGNMENT OF ERROR NO. 1:

The Court erred in permitting Doctor E. T. Pearson to testify that Douglas Leonard was not employable on January 31, 1966, since there were no medical findings reflected in the Doctor's testimony on which to base such a conclusion; said error having been timely called to the Court's attention by objection. (Transcript, Page 36)

*ASSIGNMENT OF ERROR NO. 2:*

The Court erred in permitting Doctor E. T. Pearson to testify as to the disability of the petitioner on January 31, 1966, since such alleged disability was based on nervous overlay or traumatic neurosis, and Doctor Pearson admits to being a general practitioner with no training as a psychiatrist, and thus would not be competent to testify as an expert in the field of nervous overlay or traumatic neurosis. (Transcript, Page 37)

*ASSIGNMENT OF ERROR NO. 3:*

The Court erred in finding fifty per cent (50%) permanent partial disability to the body as a whole, since there was no material evidence of any permanent disability.

*ASSIGNMENT OF ERROR NO. 4:*

There was no material evidence to support the Court's findings.

■ Defendant's first assignment of error asserts that the trial court erred in permitting Dr. E. T. Pearson to testify as to the employability of the petitioner on January 31, 1966. It is contended that no medical findings were given to support Dr. Pearson's conclusion. It appears from the record that Dr. Pearson had been treat-

ing the petitioner with some regularity from May 6, 1965, immediately after the accident occurred, until January 31, 1966. It appears that Dr. Pearson's conclusion as to petitioner's disability was based upon this entire series of examinations and treatment. No authority is cited by defendant to support this contention, and it is the opinion of this Court that the same is without merit.

■ The defendant's second assignment of error urges that Dr. E. T. Pearson, a general practitioner, was unqualified to testify as an expert in the field of nervous overlay or traumatic neurosis. It appears from the record in this case that Dr. Pearson was treating the petitioner for this condition, and was thoroughly familiar with the entire history of petitioner's nervous condition. This testimony, as to the existence of this condition, was entirely competent.

■ Defendant's third assignment of error makes the point that no material evidence was presented to show that the injury suffered by the petitioner resulted in a permanent disability. This is the serious question presented. The evidence adduced by the petitioner reveals that prior to his injury, on or about May 6, 1965, he was suffering from a nervous disorder. It appears that this nervous disorder was precipitated by his having learned that his wife was some three months pregnant before he married her, he having known her for less than two weeks before their marriage. Dr. Pearson testified that the subsequent injury on May 6, 1965 aggravated this preexisting nervous condition. Dr. Pearson's testimony is as follows:

"A. He has considerable nervous tension or overlay. I have talked to him, he is back home, and I have talked to his mother about it, and have advised her to get him

out and get him to doing something, but I don't know whether she has been successful. I haven't been very successful in getting him to try to get out and go places.

Q. Doctor, I take it that your diagnosis at this time is that there is considerable nervous overlay as a result of this traumatic experience?

A. Yes, it seems to be definitely.

Q. Do you attribute the traumatic experience in May as a factor that aggravated his state of mind?

A. I believe so, because it looks like he would have gotten over the physical disabilities by now. Of course, I didn't see him for a long period of time there while he was up in Indiana, and I don't know—I have forgotten whether he worked any or not while up there.

Q. Doctor, as a result of your diagnosis of his state of mind at this time, can you state with reasonable medical certainty an opinion as to whether he is employable on the open labor market?

A. I don't believe he is now.

Q. Doctor, I take it then that you mean by that that he would be totally disabled by virtue of his state of mind at this time?

MR. LADD: We object to this question asking for a conclusion from the doctor without any foundation on which to base it.

MR. SLAUGHTER: Let me rephrase the question.

Q. (By Mr. Slaughter) Doctor, I take it when you say that he is disabled, you mean he is totally disabled at this time?

A. I believe he is at this time.''

\* \* \* \* \* \*

"Q. You have had no training as a psychiatrist, have you, Dr. Pearson?

A. No.

Q. Do you feel that with your training as a physician, but without any psychiatry, you could state with reasonable medical certainty whether this boy's present situation is due somewhat from his injury or possibly be due from his marital situation?

MR. SLAUGHTER: We object to that and instruct the doctor that he doesn't have to answer that question. It doesn't reach the issue in this case.

MR. LADD: We will just have to come back over here.

(Discussion off the record)

THE WITNESS: The only thing I might answer, that the only thing he complains of his back and leg hurts him.

Q. (By Mr. Ladd) He still complains of this?

A. Yes.

Q. Can you find any evidence of physical injury to him now?

A. Well, I might read this conclusion of Dr. Nichols. It might help on that. Just say that I had seen him several times there and he wasn't getting any better, so I told him I wanted either an orthopedic man or a neurosurgeon to see him, and they suggested Dr. O'Connell, because he had operated on his father for a slipped disc, so I sent him over there.

This is the conclusion on that: 'It would be my impression that this patient does not have any significant nerve root involvement about the lower lumbar area. I would recommend nothing further from the neurological standpoint at this time. I would be inclined to attribute the fainting attacks to his back pain.'

Every once in awhile he blacks out.

Q. I take it from the questions Mr. Slaughter asked you, he asked if it is possible that a work connected injury aggravated his mental condition. I take it that without the injury in question, it is your opinion that he would have some disability from his pre-existing mental condition?

A. Well, he is just kind—it is kind of hard to describe what type of patient he is. He is very unstable, of course. In other words, he should have been in school and instead of that he quit school. He had known this girl about two weeks when he got married, and all those things just show that he is a very unstable person.

Q. My question is directed to the fact, doctor, that I am not sure you understand me, that even without this injury that he received on the job, I take it from your testimony that you believe due to his inherent make-up and his resulting situation and his married life, that alone could have this boy disabled now?

A. Well, he wouldn't have had this type of disability if he hadn't gotten the injuries. In other words, that gives him something to kind of hang on to, even if he didn't receive any injury. He got this injury, and the fact is his unstable nervous system, it became much aggravated. That is about the best way I can describe that.

Q. So in effect, he did or had some disability and this injury on the job in your opinion aggravated the situation?

A. Yes, I believe that is right.''

The only other medical testimony contained in the record is that of Dr. Bachman, which is well summarized in the following quotation from his testimony:

''Q. Dr. Bachman, based upon your examination of Mr. Leonard and examination of the x-rays taken previously, do you have any opinion as to whether or not Mr. Leonard has any disability?

A. In my opinion I don't think he has.''

It is the opinion of this Court that the previously quoted testimony of Dr. Pearson is some material evidence to support the trial court's conclusion that there was a causal connection between the injury suffered by petitioner on May 6, 1965, and his presently aggravated nervous condition. However, we further hold the view that the trial court's finding that this condition is permanent is not supported by any material evidence. It might be noted that Dr. Pearson was very careful to say that, at the ''present time'' the petitioner was disabled; that is, at the time his testimony was given. No opinion was expressed by him as to the permanency of this condition. Rather, it is inferable from his testimony that the complainant's disability was not rightly to be considered as permanent.

This is not to say that in every case there must be expert medical testimony as to the permanency of the injury. In some cases, it may be completely obvious that the injury is permanent, as where the Court is dealing

with loss of a hand, or there may be cases where lay testimony would establish the permanency of the injury. However, in the case at bar, we are dealing with a most complex disability, concerning which this Court is not competent to infer permanency.

The trial judge has found the petitioner's condition to be permanent, without expert opinion to that effect. In this we must conclude there is error. However, it seems apparent that petitioner has not been paid all that to which the trial court, having found causal connection between the injury and the condition of traumatic neurosis, might justifiably award him. Thus, in the plight of this record it would not be proper, as contended by counsel for defendant, to dismiss this cause. For the reasons stated, the judgment of the trial court is reversed and the case is remanded to that court for new trial. The costs of this appeal are to be equally divided between the parties.

BURNETT, CHIEF JUSTICE, DYER and CHATTIN, JUSTICES, and HARBISON, SPECIAL JUSTICE, concur.