Arnold Rae THOMAS,
Plaintiff–Appellee,

v.

AETNA LIFE & CASUALTY COMPANY
and J.T. Baker Chemical Company,
Defendant–Appellant.

Supreme Court of Tennessee,
at Jackson.

June 10, 1991.

Edwin E. Wallis, Jr., J. Mark Patey, Jackson, for defendant-appellant.

Lisa June Cox, Jackson, for plaintiff-appellee.

## OPINION

REID, Chief Justice.

This workers' compensation case presents an appeal by the employer from the judgment of the trial court awarding the employee benefits for a fifty-two percent permanent partial disability to the body as a whole. The appellant attacks the credibility of the employee's medical evidence and contends the evidence preponderates against the trial court's award. The record shows that the evidence does not preponderate against the trial court's findings.

When injured on March 17, 1986, the appellee, Arnold Rae Thomas, was working for the appellant, J.T. Baker Chemical Company, as a "distribution technician" filling customer orders by collecting products from inventory and loading them onto trucks. The employee fell while taking a box weighing approximately twenty-five pounds from a bin. He experienced pain in his back and was transported by the employer's personnel to a hospital emergency room, where he was admitted to the hospital by Dr. Larsen, a general practitioner.

The employee was hospitalized for approximately one week following the injury in March and was readmitted for several days in April. During the three-month period following his injury, the employee received outpatient treatment at the Jackson Counseling Center for depression, and the following August and October he was hospitalized at the Jackson Psychiatric Hospital. Thomas was examined and/or treated as an outpatient and while hospitalized by numerous medical experts, six of whom testified.

Drs. Glenn Barnett, Lowell Stonecipher, and Harris Smith, who testified for the employer, found no permanent disability caused by the work-related injury. Drs. Robert Barnett, Joseph Battaile, and Lorne Semrau, who testified for the employee, found work-related disability. Dr. Robert Barnett found a ten to fifteen percent disability to the body as a whole, Dr. Battaile found a twenty-five to fifty percent mental disability, and Dr. Semrau found the appellee to be unemployable.

The trial court held that as the result of the injury the employee sustained a forty percent permanent partial disability to the body as a whole as the result of physical impairment and a twelve percent permanent partial disability to the body as a whole as the result of the aggravation of a pre-existing mental condition.

The appellant-employer acknowledges that the record contains competent evidence that the employee sustained an injury in the course and scope of his employment resulting in a permanent partial disability but contends that the testimony on which permanent disability is based is not credible and that, therefore, the preponderance of the evidence is against the award.

Dr. Glenn Barnett, a neurological surgeon, saw Thomas on March 18, 1986, at the request of the general practitioner who admitted him to Regional Hospital. Dr. Barnett testified that according to the patient's history he had been "perfectly well" prior to the accident on March 17, 1986, but when he bent down on that day to lift a forty pound box he experienced a "horrible, excruciating" pain in his lower back. The patient continued to experience severe pain, which was not relieved by frequent injections of Demerol. Dr. Barnett's impression was that the patient "might possibly have an acute disc rupture," and he recommended certain diagnostic tests, including a myleogram, the results of which, according to Dr. Barnett, were normal and did not indicate a thoracic fracture.

Thomas was referred by Dr. Glenn Barnett to Dr. Stonecipher, an orthopedic surgeon, who first saw him on April 3, 1986. Dr. Stonecipher's impression was that Thomas had "a compressed fracture of T6 or T7" and "possibly a herniated disc," and he prescribed bed rest and medication for a couple of weeks. When Dr. Stonecipher saw Thomas again on April 16, 1986, he was complaining of pain in his back, arms, and legs, numbness in his hand, loss of appetite, loss of weight, and inability to sleep. X-rays taken in Dr. Stonecipher's office showed no fracture.

Dr. Stonecipher again hospitalized Thomas from April 20 through April 25, 1986. Neither x-rays nor bone scan showed a fracture. "Nerve conduction tests" on the lower leg and an EMG showed "a little denervation in the gastroc-soleus." During this confinement the patient was seen by Dr. Brueggeman, a neurologist, primarily because the patient complained of severe headaches. Dr. Stonecipher testified that a CAT scan of Thomas' head "was all right." During this hospital confinement, Stonecipher consulted with Glenn Barnett. Barnett testified Thomas repeated his prior complaints of pain and numbness which, according to his report to Stonecipher, was

most likely "tension headaches related to the chronic pain syndrome" and should be treated symptomatically.

Dr. Stonecipher saw Thomas again on May 8, 1986, and found "he wasn't any better." Stonecipher sent him again to Barnett, who testified the patient complained of constant pain below the scapula, intermittent back pain, and numbness and continual throbbing in his left leg and stated he had lost 15 pounds of weight, was unable to sleep, and was taking Tylenol, Wygesic, Feldine, and Valium. Barnett found him to be "tremulous, nervous and anxious." He testified the EMG study given on that date was normal.

The patient's final visit to Dr. Barnett was on June 9, 1986, when the complaints were "basically the same." Dr. Barnett testified with regard to the bulging disc that "[t]he presence of a, quote, diffusely bulging disc without definite disc herniation or spinal stenosis or lateral recess stenosis is not necessarily in of itself an abnormality of any consequence.... I did not feel that he had a herniated disc in March of 1986."

Dr. Stonecipher saw Thomas again on June 9, 1986, at which time the doctor "didn't find anything wrong with him" and discharged him to return to work. With reference to the disc, Stonecipher testified:

All a bulging disc means is that it is not flat on the vertebra. In other words, it may stick up a little bit higher than the vertebra. And somebody even who is twenty-five, thirty years old, that's normal. I mean, if they've got a huge bulging disc, which may be considered a herniated disc, that's a different story. But a diffusely bulging disc is of absolutely no significance to me.

With regard to disability, he testified:

[A]ccording to his history, he sustained an injury but I don't find anything wrong with him ... and I don't feel he has any permanent disability. This man hasn't got anything wrong with him. Doctor [Glenn] Barnett couldn't find anything, Dr. Brueggeman couldn't find anything, I couldn't find anything, could not substantiate it with my tests.

With regard to permanent disability, Dr. Glenn Barnett testified:

I don't believe that there is any permanent anatomical disability in this gentleman; I certainly felt on each time that I saw him that the complaints far outweighed the physical findings. And in view of the lack of objective abnormalities being present on the diagnostic studies, it was my impression that this gentleman did not have any significant problem with his back, although he certainly continued to complain quite loudly about this.

Dr. Robert Barnett, an orthopedic surgeon, saw Thomas for the purpose of evaluation on November 30, 1987, twenty months after the date of injury. Dr. Barnett reviewed the records of Thomas' treatment by Drs. Stonecipher and Glenn Barnett and of his hospitalization at Regional Hospital. From the patient he took a history of the accident, his symptoms, and treatment. Dr. Robert Barnett testified the patient's main complaints were numbness in his left hand, weakness in his hip, and pain in his upper and lower back, hip, and neck. Dr. Barnett's examination revealed good range of motion in neck and elevation of arms, less than complete range of motion in back as the result of pain, wedging of sixth and seventh dorsal vertebrae, scoliosis with left curvature of the spine, mild degenerative changes in neck and lower back, and "classical disc-like symptoms." Dr. Barnett stated that in his opinion the "lifting episode" described by the patient was the cause of his injuries. He testified Thomas should not lift any object weighing more than twenty-five pounds, should not do any repetitive lifting, binding, stooping, twisting, pushing or pulling and should not be required to sit or stand for long periods of time. He found permanent anatomical impairment of ten to fifteen percent to the body as a whole.

Dr. Semrau, a clinical psychologist, saw the employee on May 12, 1988. Thomas recounted his work history, his emotional difficulties, the pain and physical problems experienced, his failed marriages, the abusive use of alcohol and drugs, convictions

of driving under the influence of alcohol, his hospitalization and treatment at the Jackson Psychiatric Hospital, and his "sexual dysfunction and impotence." Dr. Semrau testified that prior to the accident Thomas had a "history of being a very competent man but at the time of his evaluation he was 'emotionally dysfunctional.'" He concluded that prior to the accident Thomas "was functioning, albeit with difficulty" and the accidental injury "became a catalyst" whereby Thomas became "totally dysfunctional and completely dependent upon external issues." Dr. Semrau stated the "anxiety and depression may indeed have been pre-existing" but that "the on-the-job injury was the catalyst to create the severity of these symptoms that led him to the point of being dysfunctional."

Dr. Battaile, a psychiatrist, saw Thomas on October 26, 1988. He testified his opinions were based on an interview with the patient and review of his medical records. His examination revealed the plaintiff was "significantly depressed," "had a very poor attitude in terms of the future," was afraid he "was going to be dependent on his family or someone," was "having atypical manic-depressive syndrome," had "a history of alcohol dependency," and had a history of "emotional difficulty" with his family. Dr. Battaile found that "as the result of his work injury, he had become extremely impaired in terms of his emotional status" and that the injury caused the "onset or the exacerbation of this bipolar illness." He testified the depression did not exist "at a clinical level" prior to the accident but the injury "stimulated a bipolar episode," the injury "triggered" the "bipolar disturbance," and "there was a rather dramatic change in terms of the clinical intensity" of the depression after the injury. He testified that if the plaintiff can stay away from alcohol he could be "relatively adjusted and considerably improved." Dr. Battaile concluded that the results of his examination were "consistent and compatible" with the plaintiff's account of his injury and treatment and found 25 to 50 percent disability. He also approved the conclusions reached by Dr. Semrau.

Dr. Smith, a psychiatrist, saw the plaintiff on February 8, 1989, for the purpose of evaluation. Dr. Smith testified he read the depositions of Drs. Glenn Barnett, Robert Barnett, Stonecipher, and Battaile and reviewed the records of the Jackson Psychiatric Hospital and Dr. Semrau. He testified the plaintiff told him he "sustained a compressed fracture of T6 and T7," he was concerned "he might never be able to work again ... because the pain was so bad," he "couldn't sleep," his "appetite [was] disturbed," he was not able to work because of the pain, he attended "no AA meetings," he received "no psychotherapy," and he was taking medication provided by the Veterans Administration Hospital in Memphis for "recurrent depression." Dr. Smith related Thomas' description of his episodes of depression prior to the date of the accident as follows:

He talked about feeling despondent and not wanting to talk to people. And he talked about the difficulty that he had at work: he was irritable and had difficulty in relating to people at work. And he had sometimes sleep disturbance, appetite disturbance.

Dr. Smith further testified that he learned from Thomas' former wife that prior to the accident "he did not speak to her for periods of a week at a time, seemed very preoccupied with his own thoughts, was very irritable and threatening to her and her son."

Dr. Smith expressed the opinion that the plaintiff's psychological condition was the result of "a severe problem with alcohol abuse and he has a lot of depression that he's suffered from for a long time." When asked if he had an opinion as to the cause of Thomas' current psychological and psychiatric problems, Dr. Smith stated, "I don't know." He further testified:

I think he had a preexisting problem, periods of depression that were prolonged before his injury occurred. I'm sure it would be very depressing to experience the pain that he did and go through the hospitalizations that he did. But I think he would be able to make some recovery from his depression and be able to function again.

According to Dr. Smith, Mr. Thomas experienced "reactive anxiety and depression relating to the injury." He found "some added anxiety and depression coming in with this accident" and a "depressive illness associated with severe alcoholism." He further found "alcohol makes the patient more depressed." Dr. Smith testified the plaintiff was not able to work when he saw him but he didn't "see the evidence that he has a permanent impairment." He stated that the conditions necessary for successful rehabilitation of his "psychiatric or psychological problem" are "not to drink any alcohol" and to receive "regular psychotherapy" and medication. Dr. Smith testified that it is not unusual to find lack of cooperation in refraining from the excessive use of alcohol by patients suffering from depression.

The plaintiff had been employed in responsible positions since he was in ninth grade when he worked for a small company engaged in the blueprint business. He continued to work for that company after he graduated from high school and, by the time the company was sold twelve years later, he had opened and managed a branch office and had become vice-president of the company. His subsequent work history includes employment as a security guard, a deputy sheriff, a city policeman, a military policeman, a state correctional officer, and a reproduction specialist for a blueprint company, as well as the job at which he was working when injured. His mother testified that Thomas had worked regularly since high school and had never missed any time from work because of illness, psychological or physical. Thomas' former wife testified that before the accident he went to work every day, he was a very hard worker, he cared about his job, and he was a good provider.

A co-worker testified that he "changed after the accident" and that "it would seem like he would be upset about anything to do with his job." His employment was terminated on April 15, 1987, because of excessive absenteeism.

The diagnosis of bipolar depression was made after the accident. According to the medical evidence, bipolar depression is a "chemical problem" not associated with trauma. The accepted treatment for Thomas' condition, according to the medical experts, is medication, psychotherapy, and abstinence from alcohol.

■ The only issue presented for resolution is whether the evidence preponderates against the trial court's findings. The standard of review of factual issues is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." T.C.A. § 50–6–225(e). As this Court previously has held, "[t]his standard of review differs from that previously provided and requires this Court to weigh in more depth factual findings and conclusions of trial judges in workers' compensation cases." *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315 (Tenn.1987).

Although the medical witnesses reach disparate conclusions regarding the cause and extent, if any, of the plaintiff's disability, their testimony regarding the essential facts is not inconsistent. The credentials of none of the expert witnesses were put at issue. All five of the physicians who testified are specialists in their respective fields of orthopedics, neurological surgery, and psychiatry. Dr. Semrau, Ph.D., is a licensed clinical psychologist in private practice of which approximately 15–17 percent involves vocational issues.

Contesting the trial court's finding as to causation and permanency, the appellant puts into dispute the testimonies of Drs. Robert Barnett, Stonecipher, and Glenn Barnett. The appellant argues that the testimony of Dr. Robert Barnett is not credible and that the testimony of Dr. Stonecipher and Dr. Glenn Barnett refutes Dr. Robert Barnett's testimony so overwhelmingly as to preponderate against the finding of the trial court, notwithstanding the presumption of correctness that attaches to the finding pursuant to T.C.A. § 50–6–225(e). Both Drs. Stonecipher and Glenn Barnett, the orthopedist and the neurologist hired by the employer, found no disability, whereas Dr. Robert Barnett; the

employee's orthopedist, found a ten to fifteen percent disability based on the same history used by the other two doctors, his own evaluation of the patient, and a review of the medical records.

■ Medical causation and permanency of an injury must be established in most cases by expert medical testimony. *See, e.g., Smith v. Empire Pencil Co.,* 781 S.W.2d 833 (Tenn.1989); *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d 452, 458 (Tenn.1988); *Seay v. Town of Greeneville,* 587 S.W.2d 381 (Tenn.1979). When faced, as here, with conflicting medical testimony on these issues, "it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal–Mart Stores, Inc.,* 654 S.W.2d 675, 676–77 (Tenn.1983) (citing *Combustion Engineering, Inc. v. Kennedy,* 562 S.W.2d 202 (Tenn.1978)). It should be noted that because of the presumption of correctness which attaches to the trial court's finding pursuant to T.C.A. § 50–6–225(e), the rule cited from *Hinson* remains valid even though the *Hinson* case was decided under the "material evidence" standard of review.

■ Regarding review of findings based on expert testimony, this Court stated in *Humphrey, supra,*

> [w]here the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances. In the present case, however, some of the issues involve expert medical testimony. All of the medical proof was taken by deposition or was documentary, so that all impressions of weight and credibility must be drawn from the contents thereof, and not from the appearance of witnesses on oral testimony at trial.

*Humphrey,* 734 S.W.2d at 315–16 (in dictum). *See also, Talley v. Virginia Ins. Reciprocal,* 775 S.W.2d 587, 589 (Tenn. 1989). This statement quoted from the *Humphrey* decision does not mean that the deposition testimony of experts should be read and evaluated in a vacuum. While causation and permanency of an injury must be proved by expert medical testimony, such testimony must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition. *See Smith,* 781 S.W.2d at 835 (citing *Floyd v. Tennessee Dickel Distilling Co.,* 225 Tenn. 65, 463 S.W.2d 684 (1971)). As stated above, considerable deference must be given to the trial court's evaluation of such oral testimony. In this case, the evidence concerning the employee's back injury came from the employee, who described how the accident happened and what effect the injury has had on his back, as well as the deposition testimony of the medical experts. While there is conflicting medical expert testimony, the evidence does not preponderate against the findings of the trial court.

With regard to the employee's mental condition, Dr. Smith, the psychiatrist who testified on behalf of the employer, stated that even though he did not "see the evidence that he has a permanent impairment," the injury "is bound to add to the anxiety and depression that a person is experiencing." He testified further that "he sees himself as a real failure because he feels that he really messed up with the alcohol, pills; and then having the accident, that just finished him off." Dr. Battaile, the psychiatrist who testified on behalf of the employee, recognized Thomas had a pre-existing condition and stated that the injury was "the onset or the exacerbation of this bipolar illness" and that "after the injury he developed a full blown bipolar disorder resulting in a twenty-five to. fifty percent disability." He further testified that even though proper treatment and abstinence from alcohol would improve the patient's condition, he also stated, "I don't think that that's going to go away, and therefore, there's a certain permanency to it." He further related the causal connection between the injury and the impairment and the permanency of the impairment with the testimony, "I think this thing [in-

jury] triggered an illness which is life long." The testimony of the clinical psychologist, Dr. Semrau, is even more supportive of the employee's position that the mental disorder was caused by the injury and that the condition is permanent.

■ The aggravation, acceleration, or exacerbation of a pre-existing condition or disease brought about by an accidental injury or occupational disease is compensable. *Swift and Co. v. Howard,* 186 Tenn. 584, 212 S.W.2d 388 (1948). This rule applies to the aggravation of a pre-existing "nervous" condition by a physical injury. *Minton v. Leonard,* 219 Tenn. 642, 412 S.W.2d 886 (1967).

■ The evidence in this case shows that the employee suffered an aggravation of a pre-existing mental illness or condition as a result of the accidental injury to his back, which occurred in the course of and arising out of his employment. While there was some difference of opinion among the expert witnesses concerning the extent of the aggravation of the condition, as well as its permanency, the evidence does not preponderate against the trial court's findings.

The judgment of the trial court is affirmed.

The appellee's motion that the Court find that this appeal was taken frivolously, in violation of T.C.A. § 27–1–122, is denied.

The costs are taxed to the appellant.

DROWOTA, O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.