**Douglas A. BATSON, Plaintiff–Appellee,**

v.

**CIGNA PROPERTY AND CASUALTY COMPANIES, Defendant–Appellant.**

Supreme Court of Tennessee,
Special Workers' Compensation Appeals Panel.

March 25, 1994.

Janet L. Hogan, Hogan & Hogan, Knoxville, for appellant.

Ward S. Whelchel, Knoxville, for appellee.

Members of Panel: CHARLES H. O'BRIEN, Associate Justice, Supreme Court, WILLIAM M. DENDER, Senior Judge, and PENNY J. WHITE, Judge, Tennessee Court of Criminal Appeals.

## MEMORANDUM OPINION

WHITE, Judge, Court of Criminal Appeals.

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tennessee Code Annotated Section 50–6–225(e)(3) for hearing and reporting to the Supreme Court of findings of fact and conclusions of law.

Plaintiff Douglas A. Batson was a concrete truck driver for Apac on November 26, 1990 when he sustained an injury to his right knee. Plaintiff was treated initially by Doctor Smalley of the Maryville Orthopaedic Clinic but was later transferred upon request to Doctor Gouffon who had performed an earlier surgery on plaintiff's left knee. As a result of the referral, Doctor Gouffon performed two arthroscopic surgeries on plaintiff's right knee and partially removed torn meniscus. The injury and the resulting surgery left plaintiff with a permanent impairment to his right lower extremity. Doctor Gouffon assessed a five percent permanent partial impairment to the leg and Doctor Hyde, who plaintiff consulted concerning his permanent impairment, assessed a fifteen percent impairment to the leg and placed weight restrictions of forty-five to fifty pounds as well as a restriction to avoid excessive stair climbing. Doctor Gouffon's opinion was that plaintiff could be released with no restrictions following his recuperation from surgery. Both Doctor Gouffon and Doctor Hyde agreed the plaintiff could return to work.

Upon returning to work, initially plaintiff was assigned a variety of light duties, specifically created by his employer to accommodate his physical limitations during his recuperation period. Plaintiff began to experience psychological problems, included hostility, anger, depression, and stress, which he claimed was as a result of his perception of being mistreated by his supervisors and being forced to work in isolation in a small confined area on the employment premises. As a result of his psychological problems, plaintiff became more and more depressed and sought the help of a psychiatrist. Shortly after engaging in counseling, plaintiff took a voluntary layoff from his job because, as he testified, he was led to believe he would be rehired. Defendant's agents testified that the layoff was as a result of a down time for the company and that no rehiring was anticipated. In any event, plaintiff was not rehired.

Following his voluntary layoff, plaintiff's hostilities became focused on his former supervisors and his company. He believed he had been tricked into a layoff by his supervisors and had a difficult time adjusting to the proposition of being unemployed. Batson testified that his "emotional problems come [sic] from the way I was lied to, the way they suckered me into doing it to get rid of me, the way they punished me and put me in a little shack instead of letting me learn something."

Doctor Marshall, appellee's treating psychiatrist, testified that Batson had a hereditary illness called bipolar disorder, mixed type. Doctor Marshall found that there was no evidence in Batson's previous history that he had ever had difficulties with emotional problems prior to November. Although Batson's condition was hereditary and some symptoms existed before November, Batson had never become "full-blown" manic depressive bipolar before the employment episode. Since November, Batson had demonstrated homicidal and suicidal feelings and had been medicated on varying medicines with different degrees of success.

Doctor Marshall was of the opinion that Batson was forty percent permanently disabled as a result of his inability to deal with people. His opinion was that the knee problem triggered Batson's depression by disabling him and removing him from his capacity to support his family. The doctor testified that regular employment would be therapeutic and that he was encouraging Batson to return to work as long as he felt he could handle it.

Because of what was perceived as ambiguity in Doctor Marshall's testimony, the court adjourned the case for the supplementation of Marshall's deposition. In the supplemental deposition, a hypothetical question was posed that asked Doctor Marshall to assume that the plaintiff did not know of his psychiatric condition, had not had psychiatric episodes of significance or received prior psychiatric treatment before November 26th, and that, following his injury on November 26th, he began to experience symptoms of inability to sleep, rumination over loss of ability to provide for family, loss of appetite, irritability, memory loss, loss of pleasure, crying spells, and other symptoms. Based on these hypotheses, Marshall testified that while the plaintiff had the predilection to have the disease, his treatment by his employer and his feeling about losing his ability to provide for his family led to the exacerbation of the disease so that a previously theoretical disease became a clinical existing disease.

At the supplemental deposition Doctor Marshall characterized plaintiff's condition as permanent, finding that plaintiff had a "very large impairment ... up around eighty to ninety percent [socially] with a physical impairment of about forty percent to the body as a whole." Marshall also testified that the plaintiff needed continuing psychiatric care for his condition.

Based upon this testimony and the testimony of the plaintiff's physical disability, the court concluded that the plaintiff was one hundred percent permanently disabled and entitled to compensation based on one hundred percent permanent disability. The court's factual findings were as follows:

> Mr. Batson had a bipolar condition which, according to Doctor Marshall, is hereditary in nature. The condition, also known as manic depression, largely was not anything serious before the petitioner—prior to the injury to the right knee and he did not seem to immediately have mental problems. However after the injury and treatment and his return to light duty problems began to develop.
>
> .    .    .    .    .
>
> He said that upon returning to work his knee, perhaps both of his knees, hurt constantly. He was given work which at one point pretty much isolated him so that he was working alone. His reaction to all of this was extreme and as required caused his continuing care on a regular two week visit basis with Doctor Marshall who continued as his treating physician for mental problems.
>
> The plaintiff felt that he was not being fairly dealt with by his employer and feared loss of employment. He became very bitter and angry. His bitterness and anger was largely being directed towards the treatment he felt to be unfair upon him.
>
> He returned to work. As wintertime approached and the company work slacked off he was offered a voluntary layoff, which normally would be considered short-term; that is over the cold weather period when there was not so much work to be done. He did take the voluntary layoff and has not since returned to work.
>
> While under the care of Doctor Marshall, who has been regularly treating him with drugs of various kinds, Doctor Marshall testified to his having extreme depression, becoming very angry, having severe suicidal thoughts and there is evidence that aside from—from killing himself he might kill others such as his wife or other family members.

The court compared the testimony of an examining psychiatrist, Doctor Burston, who found no depression, and concluded that Doctor Burston's testimony was not sufficient to undercut the conclusions reached by Doctor Marshall.

The court noted the cautionary approach which is taken with disability arising from mental and emotional problems, but concluded that this case was distinguishable. Based upon Doctor Marshall's testimony, the court concluded that

> there was a logical connecting set of events beginning with the injury and this claimant being predisposed to bipolar condition reacted to that injury as he did.... [H]e had a significant injury that went to disable him from working and from that the

mental condition became so severely manifested that he was unable to work.

So we find that the mental condition was a direct causal event following from and caused by the twisting knee injury and his care and treatment following the same.

Based on Doctor Marshall's testimony then the trial court concluded that causation and permanency had been established and that plaintiff was entitled to compensation for one hundred percent permanent and total disability and to continued medical care.

Based upon those findings the defendant challenges the sufficiency of the evidence to sustain a finding of compensability and permanency under the Act. The defendant also challenges the trial court's decision to allow the supplemental deposition of Doctor Marshall at the close of the proof. The plaintiff requests cost of the appeal based on a finding that the appeal was frivolous. We will address the issues in reverse order.

■ First, our analysis of this issue leads us to conclude that there can be no finding that the appeal of this matter was frivolous. As the trial court noted, and as we have found, the issues in this case are very close. In no way can the appeal of this matter be deemed to be frivolous or taken solely for the purpose of delay. For that reason we decline to find the defendant responsible for the plaintiff's costs on appeal. *See* Tenn. Code Ann. § 50–6–225(i).

■ We further find no merit to the argument that the trial court was without authority to direct the supplementation of Doctor Marshall's deposition. Doctor Marshall's supplemental deposition was consistent with his first deposition. The trial court had proper authority to direct the supplementation to assure the comprehensive development of the issue. *See Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315 (Tenn. 1987); *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d 452 (Tenn.1988). We commend him for doing so.

The difficult question in this case is whether the evidence supports a finding that Batson's mental condition was causally related to his work injury. Although the appellant has also raised the issue of permanency, Doctor

Marshall's depositions clearly establish that the mental condition is permanent.

■ This Court has been called upon many times to address whether mental disorders are occupational diseases or compensable accidental injuries under our workers' compensation statute. In the leading case, *Jose v. Equifax, Inc.,* 556 S.W.2d 82 (Tenn. 1977), an insurance claims adjustor alleged that his psychiatric illness and alcoholism were attributable to on-the-job pressure and tension. The trial judge dismissed the complaint and we sustained that dismissal holding that:

> In proper cases we are of the opinion that a mental stimulus, such as fright, shock or even excessive, unexpected anxiety, could amount to an "accident" sufficient to justify an award for resulting mental or nervous disorder.

Clarifying the *Jose* holding, we ruled in *Allied Chemical Corporation v. Wells,* 578 S.W.2d 369 (Tenn.1979), that worry, anxiety, and stress "within the bounds of the ups and downs of emotional normal human experience" are insufficient to support an award. 578 S.W.2d at 373 (citing 1B A. Larson, Workmen's Compensation Law, 7–152 (1978)).

Relying on our holding in *Jose,* we declined to allow recovery for a chairman of the board, president, and sole stockholder of a construction company who suffered from acute anxiety reaction following serious business losses. In *Mayes v. United State Fidelity and Guaranty Company,* 672 S.W.2d 773 (Tenn.1984), we held that "[t]he mental stimulus which precipitated the Plaintiff's anxiety is not the type envisioned in *Jose*" ... but fell "within the category of the usual stress and strain encountered in the operation of a contracting business." 672 S.W.2d at 775.

Similarly in *Henley v. Roadway Express,* 699 S.W.2d 150 (Tenn.1985), we rejected a claim made by a worker that the stress of third-shift work and lack of sleep had caused or aggravated a condition of depressive neurosis. We deemed that claim "beyond the reasonable limits of the statutory criterion of injury by accident" and not causally connected to employment. Using the same rationale

we upheld the denial of an award in *Gentry v. E.I. Dupont De Nemours & Co.,* 733 S.W.2d 71 (Tenn.1987), wherein a worker experienced stress when the recording of a personal phone call at work led the worker to confess an adulterous affair to her spouse. *See also Cigna Property & Cas. Ins. Co. v. Sneed,* 772 S.W.2d 422 (Tenn.1989) (emotional problem suffered upon termination does not constitute compensable work-related injury).

■ Most recently in *Gatlin v. City of Knoxville,* 822 S.W.2d 587 (Tenn.1991), we denied benefits to a police officer who alleged on-the-job stress had triggered his psychiatric condition which included depression, paranoia, and a major affective disorder. We reversed the trial court's award because the proof "[did] not meet the *Jose* test of an identifiable stressful event producing a sudden fright, shock, or excessive unexpected anxiety." 822 S.W.2d at 592. Thus we held definitively that "for a mental injury by accident or occupational disease to arise out of employment it must be caused by an identifiable, stressful, work-related event producing a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety, and therefore it may not be gradual employment stress building up over a period of time." *Id.* at 591–92.

■ In each of those cases the claimant attempted to recover solely for psychological disorders which arose from stresses on the job. Because they generally occurred gradually over time and not as a result of a sudden occurrence, we have declined to view the resulting mental disorder as arising out of a work-related accident as required by our statute. Additionally, these psychological disorders developing as a reaction to employment stresses have generally not met our statutory occupational disease criteria. Consequently, psychological conditions developed or enhanced by on-the-job pressures and stress and occurring separate and apart from any physical injury are largely noncompensable under our workers' compensation statutes.

■ As the trial judge in this case aptly noted, Batson's claim for compensation is not based upon a psychological condition separate and apart from a physical injury. Rather, it is based upon a psychological condition which the court found was caused by a physical condition. As the trial judge reasoned in distinguishing *Cigna Property & Cas. Ins. Co. v. Sneed,* 772 S.W.2d 422 (Tenn.1989), the case relied on by the appellant:

> In ... Sneed ... the claimant was not seeking to show that the physical injury was the cause of the disability, but that there was in effect a second accident within the meaning of the compensation law....
>
> We are not finding a second injury here.... Here he had a significant injury that went to disable him from working and from that the mental condition became so severely manifested that he was unable to work.
>
> So we find that the mental condition was a direct causal event following from and caused by the twisting knee injury and his care and treatment following the same.

(emphasis added).

Thus, this case is more akin to *Gluck Brothers, Inc. v. Pollard,* 221 Tenn. 383, 426 S.W.2d 763 (1968) and *Minton v. Leonard,* 219 Tenn. 642, 412 S.W.2d 886 (1967), in which the employees suffered injuries as a result of an accident arising out of and in the course of employment and then experienced mental disorders as a result of the original injury. In both cases competent medical evidence supported a finding that the resulting psychiatric disorder was caused or aggravated by the compensable work-related injury. Thus recovery was allowed.

In light of the specific factual findings made by the learned chancellor in this case, considered de novo with a presumption of correctness, we affirm the court's finding that the manifestation of Batson's psychological disorder was a direct and causal result of his work-related knee injury.

■ Having concluded that Batson's condition was caused by his on-the-job injury and was permanent, the trial judge awarded one hundred percent permanent disability to the body as a whole. The lay and expert testimony support this award. Doctor Mar-

shall's testimony, appellee's work, educational, and social history, and all the evidence support this conclusion.

For all these reasons, we affirm the findings of the trial court and the judgment in this case. Costs of this appeal are taxed to the appellant.

/s/ Charles H. O'Brien

Charles H. O'Brien, Associate Justice

Supreme Court

/s/ William M. Dender

William M. Dender, Senior Judge