



**FILED**
**Aug 15, 2019**
**10:35 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Terri Holdway | ) | Docket No.  2017-08-0751 |
| | ) | |
| v. | ) | State File No.  15611-2016 |
| | ) | |
| Lakeside Behavioral Health Systems, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Thomas L. Wyatt, Judge | ) | |

---

### Affirmed and Certified as Final

---

Following a physical assault in the workplace, the employee initiated a claim for workers' compensation benefits for her alleged physical and mental injuries.  The employer accepted the claim for the physical injuries but denied that the employee's alleged mental injury arose primarily out of the work incident.  Following a trial, the court concluded the employee did not prove by a preponderance of the evidence that she developed a mental injury arising primarily out of and in the course and scope of her employment and denied benefits for the alleged mental injury.  The employee has appealed.  Having thoroughly reviewed the record, we conclude the preponderance of the evidence supports the trial court's determination.  We affirm the trial court's decision and certify it as final.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

Monica R. Rejaei, Memphis, Tennessee, for the employee-appellant, Terri Holdway

Gregory H. Fuller, Brentwood, Tennessee, for the employer-appellee, Lakeside Behavioral Health Systems

### Factual and Procedural Background

Terri Holdway ("Employee") was sixty-five years of age when she was assaulted in the workplace while in the course and scope of her employment as a registered nurse with Lakeside Behavioral Health Systems ("Employer").  On February 24, 2016, she was in one of Employer's medication rooms for the purpose of dispensing medications to

1

patients when a male patient jumped over the lower part of a Dutch door to gain entry to the medication room.[1]  In the process of moving toward a counter where medications were located, the patient knocked Employee down, resulting in severe injuries.[2]

On March 8, 2016, Employee underwent an open reduction with internal fixation for complex fractures on the right side of her face performed by Dr. Lawrence W. Weeda, Jr.  In addition to receiving treatment from Dr. Weeda, Employee was evaluated by an eye doctor and a dentist.  She complained to Dr. Weeda about neurological issues and was provided a panel of physicians from which she selected Dr. Barbara Cape.  Employee testified she told Dr. Cape she had anxiety and "how scared [she] was of everything," but, according to Employee, Dr. Cape "didn't see a whole lot" and did not find any neurological problems.

Employee testified that, on post-surgical visits, she was evaluated by medical residents and estimated she saw "at least four" over the course of her treatment with Dr. Weeda.  Although she could not recall the names of any of the residents, Employee said she told the residents how nervous she was and that she was having a hard time leaving her house and was "afraid to go out."  She testified one of the residents encouraged her to consider a psychological evaluation, but that Employer never offered her a panel from which she could select a physician for such evaluation.  Employee admitted that, as far as she could recall, Dr. Weeda never made a referral for a psychological evaluation.  She further admitted that she did not recall any conversations with Employer's insurer in which she requested a psychological referral.  However, Employee maintains that she told several people at work that she "needed to see somebody" because she "wasn't doing very well."  Employer's Human Resources Director, Lori Deason, testified she did not recall any conversations with Employee during which Employee requested a psychological evaluation or a panel of psychologists or psychiatrists.

When asked about her daily activities following the February 2016 incident, Employee testified "[i]t's hard to take care of daily activities," adding that she did not care about doing that.  She testified that when she went out in public "[a] lot of times [she] felt] scared," but she didn't know what she was scared of, "just [s]cared."

---

[1] A Dutch door is a door that is split horizontally across the middle to allow the top half to open while the bottom half remains closed.

[2] The record is unclear as to the exact manner in which the assault occurred.  Employee testified she told the patient she would get his medication and turned to walk to the counter to check the chart for the appropriate medication, stating that "is the last thing [she] remember[s]" before waking up on the floor bleeding from her head and face while others, including nurses, medics, and patients, had surrounded her.  Employer's Human Resources Director testified she reviewed a video of the incident and observed a male patient rushing through the opening and moving toward the counter while Employee was in his pathway, knocking Employee down.  Medical records include varied accounts of the incident with some indicating the patient struck Employee in the face with his fists.

Employee returned to work with Employer in April 2016 and continued working for approximately eight months until she resigned on December 8, 2016. She testified that when she returned to work she was "hypervigilant" in distributing medications to patients and experienced on-going anxiety. During the eight months following her return to work, there were other episodes in which patients were verbally or physically abusive to her, including one patient who spit on her and threw a wheelchair at her. Employee testified "it just got too intense." She expressed frustration that Employer "did nothing to change the situation where [she] got hurt."

On December 8, 2016, Employee reported to work and discovered the facility was short-staffed. She testified she was instructed to take on additional responsibilities regarding the distribution of medications to patients. Employee decided she was unable to perform her work duties. She wrote a resignation letter that she gave to her supervisor and left the facility. After leaving, she thought more about her actions and called Employer to advise that she wanted to rescind her resignation. A meeting was scheduled for the following day for Employee to discuss the situation with Ms. Deason.

Ms. Deason testified that in the meeting Employee wanted to rescind her resignation and "explained that she was anxious and fearful that she would not be able to take care of the patients," adding that "[s]he was very clear that she was not fearful of the patient[s] but of her ability to take care of them [] [a]nd that's the reason that she left." Ms. Deason told Employee that because she had abandoned her job the previous day, she would not be allowed to return to work. She suggested Employee contact the company's Employee Assistance Program ("EAP").

Ms. Deason was questioned about Employee's resignation letter in which Employee wrote that she was resigning "due to medical and emotional issues that have come up since [she] was attacked by a patient in February." Asked about Employer's "corrective action report," which indicated Employee's termination was for "personal reasons," and why the resignation letter "didn't get added as a reason for [Employee's] departure," Ms. Deason responded that "[t]here are a limited number of items [she] can choose in [her] electronic database for reasons why a person would leave," and "an injury" is not one of them. She added that, "in our conversation, the injury did not come up, just [Employee's] feelings about how she could not take care of the patients." Although Ms. Deason testified she never discussed a referral for a psychological evaluation in the meeting, she said she did recommend that Employee contact Employer's EAP due to Employee being "anxious." Because of the confidential nature of such programs, Ms. Deason did not know if Employee ever contacted Employer's EAP.

At the time of the trial, Employee was sixty-eight years of age. She attended the trial in a wheelchair because she had "extreme arthritis in [her] knees." She testified her arthritis was not related to her on-the-job injury, but said she "also uses a wheelchair for

3

panic and anxiety when [she] can't walk." Asked whether she attributed her inability to walk to the 2016 work injury, she testified "[i]t didn't affect my walking per se. It affected my mental state to where I cannot do it." Employee also testified she told Dr. Joel Reisman, a psychiatrist engaged by Employer to evaluate Employee, that, "at times," she had trouble walking due to her post traumatic stress disorder ("PTSD") symptoms. Employee further testified that she had a stroke in September 2018, which she explained "caused my balance to be off," adding that she "fell a lot during 2017." Employee testified she has not worked since leaving her job with Employer in December 2016.

Employee acknowledged in her testimony that she had suffered from anxiety prior to the 2016 work incident. She testified that her anxiety increased in 2015 due to an increase in her workload, working longer hours, and fatigue. As a result, she saw her primary care physician who prescribed Zoloft, but Employee stated she only took the medication "a couple of times" because of how it made her feel. She also acknowledged that, at the time she saw her primary care physician in 2015, she had other issues that she discussed with her doctor, including her father's illness and the death of her dog. As stated by the trial court, the record of Employee's 2015 visit "noted that [Employee] said her 'life was out of control,'" and that Employee "reported depression, anxiety, fatigue, weight change, sleep disturbance, and decreased concentration." At trial, Employee denied that the anxiety she was experiencing in 2015 had any impact on her ability to perform her job duties.

*Expert Medical Testimony*

Following her resignation, Employee contacted Employer's EAP and was referred to Wendy Holdsworth, a licensed clinical social worker, who she began seeing in January 2017. Employee reported some improvement in her symptoms, but testified she continued to experience panic attacks and anxiety symptoms. She also sought treatment from a nurse practitioner, Mark Hesselrode, who diagnosed her with restless leg syndrome, generalized anxiety disorder, PTSD, and panic disorder. In March 2017, Mr. Hesselrode prescribed Employee an antidepressant medication.

During his deposition, the authorized physician, Dr. Weeda, described his initial evaluation of Employee in the emergency room and the surgery he later performed. Following the surgery, Dr. Weeda prescribed antibiotics and pain medications. Postoperatively, Employee complained of blurry vision, which Dr. Weeda described as a common symptom following the type of surgery Employee had undergone. In his April 6, 2016 report, Dr. Weeda noted that the patient was "very upset." He explained that "she said she had psychological issues after the incident and in the way that it happened." Dr. Weeda testified that he supervised several medical residents as part of the medical training program run by his department, and that one of his residents had written on the report that Employee was "encouraged to see a psychologist or a psychiatrist for issues that she was describing." Dr. Weeda acknowledged during his testimony that this was

4

one of the residents who participated in Employee's care and who was under his direct supervision. As to the recommendation, Dr. Weeda testified, "it's not uncommon with the trauma patients that we see that it takes them a while to get over the psychological trauma that occurs. . . . [I]n the two or three times we see them postoperatively, . . . if we feel that they're . . . having psychological issues, we will frequently make the recommendation." When Dr. Weeda was asked whether he agreed with the resident's recommendation, he replied, "I think that's reasonable."

On May 2, 2018, Employee was evaluated by a board-certified psychiatrist, Dr. Melvin Goldin. Dr. Goldin testified that Employee suffered from PTSD that was more than fifty percent caused by the February 2016 work incident. Dr. Goldin concluded Employee would retain a ten percent permanent impairment as a result of her PTSD. He also testified she would "require psychotherapy for probably years and pharmacotherapy . . . for at least as long." Dr. Goldin recommended that Employee not return to work in a psychiatric unit.

At Employer's request, Employee was evaluated by Dr. Joel Reisman, also a board-certified psychiatrist. Dr. Reisman reviewed records from multiple providers as well as deposition testimony of Employee and other experts. He conducted an examination of Employee and prepared a lengthy report summarizing the information he had reviewed and the opinions he had formed. Dr. Reisman concluded that Employee did not suffer from PTSD and that she had not been honest regarding her mental health treatment prior to the incident at work. He also concluded that Employee's anxiety disorder pre-existed the work incident. On cross-examination, Dr. Reisman admitted that the only indication of prior treatment for a psychological condition was in 2015. He also acknowledged that Employee had been prescribed medication to treat her psychological condition after the work incident.

Following trial, the court concluded Employee had not met her burden of proving she developed a mental injury arising primarily out of and in the course and scope of her employment. The court denied workers' compensation benefits for Employee's mental injury claim and her requests for attorneys' fees and a penalty. The court awarded on-going medical benefits for her physical injuries. Employee has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2018). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence."

*Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2018).

**Analysis**

Tennessee's Workers' Compensation Law has long recognized that psychological claims may be compensable. In accordance with Tennessee Code Annotated section 50-6-102(14) (2018), mental injuries are compensable if they arise primarily out of and in the course and scope of employment. Moreover, the law defines a mental injury as:

> [A] loss of mental faculties or a mental or behavioral disorder, arising primarily out of a compensable physical injury or an identifiable work related event resulting in a sudden or unusual stimulus, and shall not include a psychological or psychiatric response due to the loss of employment or employment opportunities.

Tenn. Code Ann. § 50-6-102(17).

Mental injury claims generally fall into one of two categories: those that arise primarily from an accident with a compensable physical injury and those that are caused by a sudden or unusual mental stimulus. The law concerning mental injuries has been summarized as follows:

> The Tennessee Supreme Court has long recognized two factual situations in which employees may recover workers' compensation benefits for mental disorders. First, recovery has been allowed for a mental injury by accident or occupational disease, standing alone, if the mental disorder is "caused by an identifiable stressful, work-related event that produces a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety." Second, compensation for psychological injuries has been allowed when an employee sustains a compensable work-related injury by accident and thereafter experiences a mental disorder which is caused by the compensable work-related injury.

*Bressler v. H & H Specialty Coatings, Inc.*, No. W2007-02902-WC-R3-WC, 2009 Tenn. LEXIS 41, at *12 (Tenn. Workers' Comp. Panel Mar. 9, 2009) (citations omitted).

In the present case, it is undisputed that Employee suffered a compensable physical injury. It is also undisputed that she does not remember the physical assault. Thus, the relevant question under these circumstances is whether Employee proved by a preponderance of the evidence that her alleged mental injury arose primarily from the compensable physical injury. In making this determination, it is unnecessary to determine whether Employee identified a sudden or unusual mental stimulus beyond ordinary work stress because that requirement applies only in those cases where an employee is alleging a mental injury without an accompanying physical injury. *See, e.g.*, *Woods v. State*, No. W2005-02119-SC-WCM-CV, 2006 Tenn. LEXIS 970, at *9 (Tenn. Workers' Comp. Panel Oct. 30, 2006) (discussing mental injuries that "accompany a work-related physical injury and aggravate the pre-existing mental problems of the worker").

In addition, an employee who has a pre-existing mental condition may establish the compensability of a mental injury arising from a compensable physical injury if he or she can prove by a preponderance of the evidence a compensable aggravation of a pre-existing mental condition. As we have discussed previously,

> [a]n employer takes an employee "as is" and assumes the responsibility of the employee having a pre-existing condition aggravated by a work-related injury that might not affect an otherwise healthy person. An employer may be liable for disability resulting from injuries sustained by an employee arising out of and in the course of his employment even though it aggravates a previous condition with resulting disability far greater than otherwise would have been the case.

*Mace v. Express Serv.*, No. 2015-06- 0059, 2015 TN Wrk. Comp. App. Bd. LEXIS 19, at *9-10 (Tenn. Workers' Comp. App. Bd. June 19, 2015) (citations and internal quotation marks omitted); *see also Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 764 (Tenn. 2000) (discussing a compensable aggravation of a pre-existing mental disorder); *Duncan v. Modine Mfg. Co.*, No. E2000-02995-WC-R3-WC, 2002 Tenn. LEXIS 88 (Tenn. Workers' Comp. Panel Feb. 28, 2002) (affirming an award of permanent disability benefits due to the aggravation of a pre-existing mental disorder).

Here, the trial court concluded that neither Employee's testimony nor the medical proof established that Employee's mental symptoms following the work assault substantially differed from those she reported to her primary care physician eight months before the incident. The court noted that, following the assault, Employee returned to work "and for the next eight months she successfully endured the same general work stress that she experienced before her injury," adding that "[i]n fact, she exhibited sufficient mental strength to continue working . . . even after a patient spat and threw a wheelchair at her." Although the court did not expressly address the credibility of the witness's testimony, the court concluded Employee was terminated "not because of her

7

disability but rather a disagreement with her supervisor," which was not the reason Employee asserted in her resignation letter.

The trial court's decision turned largely on the expert medical proof. The court contrasted the testimony of Dr. Goldin and Dr. Reisman and concluded Employee did not establish a mental injury arising primarily out of her employment. Specifically, the trial court determined that both of the psychiatrists were equally qualified to assess a claim for a psychiatric injury, but that Dr. Reisman "provided the more probable explanation for [Employee's] mental symptoms." The trial court noted that Dr. Reisman had a more complete history than Dr. Goldin, including "the fact that [Employee] sought treatment for depression and anxiety related in part to general job stress before the work-related assault," which Dr. Goldin did not learn until his deposition was taken. Moreover, the trial court concluded, as did Dr. Reisman, that Employee did not develop avoidance of the place and circumstances of the triggering trauma that both doctors testified to be necessary for a proper diagnosis of PTSD. A trial judge "has the discretion to conclude that the opinion of one expert should be accepted over that of another expert." *Reagan v. Tennplasco*, No. M2005-02020-WC-R3-CV, 2006 Tenn. LEXIS 1209, at *10 (Tenn. Workers' Comp. Panel Dec. 27, 2006). As stated by the Tennessee Supreme Court, "[w]hen faced . . . with conflicting medical testimony . . . , it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Thomas v. Aetna Life & Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991) (internal quotation marks omitted). While the medical causation opinions of Drs. Goldin and Reisman conflict, we conclude the evidence does not preponderate against the trial court's decision.

### Conclusion

Accordingly, we affirm the trial court's compensation hearing order and certify it as final. Costs on appeal are taxed to Employee.



| Terri Holdway | ) | Docket No. 2017-08-0751 |
|---|---|---|
| | ) | |
| v. | ) | State File No. 15611-2016 |
| | ) | |
| Lakeside Behavioral Health Systems, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Thomas L. Wyatt, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 15th day of August, 2019.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Monica R. Rejaei<br>Laurel Baggett | | | | | X | mrejaei@nstlaw.com<br>lbaggett@nstlaw.com |
| Peter Frech<br>Gregory H. Fuller<br>Julia Russo | | | | | X | ppfrech@mijs.com<br>ghfuller@mijs.com<br>jlrusso@mijs.com |
| Thomas L. Wyatt, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov