FILED

November 10, 2016

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

Time: 1:54 P.M.



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### COURT OF WORKERS' COMPENSATION CLAIMS
### AT JACKSON

| | | |
|---|---|---|
| **TERESA DYER,** | ) | **Docket No.: 2015-07-0460** |
| **Employee,** | ) | |
| **v.** | ) | |
| **SUPPORT SOLUTIONS OF** | ) | **State File Number: 27218-2015** |
| **THE MID-SOUTH,** | ) | |
| **Employer,** | ) | |
| **And** | ) | |
| **LIBERTY MUTUAL INS. CO.,** | ) | **Judge Allen Phillips** |
| **Insurance Carrier.** | ) | |
| | ) | |

## EXPEDITED HEARING ORDER FOR MEDICAL BENEFITS

This matter came before the undersigned Workers' Compensation Judge on November 1, 2016, upon the Request for Expedited Hearing filed by Teresa Dyer pursuant to Tennessee Code Annotated section 50-6-239 (2015). Ms. Dyer requests a surgical procedure recommended by the authorized treating physician for treatment of a right-shoulder injury. Liberty Mutual, on behalf of Support Solutions, denied the requested surgery based upon a Utilization Review (UR) report and subsequent adoption of that report by the Bureau's Medical Director. Accordingly, the central legal issue is whether Ms. Dyer is entitled to the requested surgery when considering the divergent medical opinions. For the following reasons, the Court holds Ms. Dyer is entitled to continued medical benefits including the requested surgery.[1]

### History of Claim

Ms. Dyer sustained a right shoulder injury on January 12, 2015. Liberty Mutual did not contest the injury, but disputed a surgical procedure recommended by Dr. Kelly Pucek, the authorized treating physician.

---

[1] A complete listing of the technical record and exhibits admitted at the Expedited Hearing is attached to this Order as an appendix.

1

Ms. Dyer began treatment with Dr. Pucek on April 20, 2015. On that date, she reported a history of shoulder pain beginning six to eight weeks earlier when "doing a lot of repetitive lifting." (Ex. 1 at 9). She noted having seen a general practitioner and having done "exercises, which have not lessened her pain." *Id.* On examination, Dr. Pucek found "obvious impingement signs of [the] right shoulder" and "pain and weakness in terms of abduction, external rotation." *Id.* He diagnosed "rotator cuff syndrome," injected her shoulder with pain medications, and recommended physical therapy. *Id.* Upon her return on May 27, 2015, she "noted some improvement, but still [was] having activity limiting pain." *Id.* at 12. Her examination was unchanged. Dr. Pucek noted that, "[g]iven only partial response to injections, therapy, and conservative treatment, I think the next step is going to be MRI evaluation of the shoulder as to whether we are looking at anything surgical." *Id.*

On July 9, 2015, Dr. Pucek recorded the MRI results as showing "some inflammatory changes in her rotator cuff [and] surprisingly extensive labral tearing. *Id.* at 18. Dr. Pucek further noted: "With her failure with conservative treatment, MRI showing extensive labral tearing, I think she is ultimately looking at a scope with labral debridement versus repair. I went over risks and benefits as well as what to expect. She does want to proceed." *Id.*

Liberty Mutual referred the surgery request to an independent UR agent for review. On July 23, 2015, Dr. Glenn Smith, an orthopedic surgeon licensed in Tennessee, completed a "Peer Review Report." Therein, he noted his review of the treatment notes detailed above, the MRI report, physical therapy notes, and the notes of the initial provider. He documented two separate attempts to contact Dr. Pucek. He then detailed a "Summary of Records" and "Review Question" as follows:

**SUMMARY OF RECORDS:**
This is a female was has [sic] sustained an injury on January 12, 2015, from opening and closing a lot of binders and putting boxes on the floor.

The examinee has been treated conservatively with physical therapy and when failing to respond an MRI was performed June 26, 2015, that noted extensive tearing of the labrum anterior and anterior inferior with posterior superiorly noted tearing.

The biceps was in the normal position.

On July 9, 2025, Dr. Pucek indicated in followup review of the MRI findings the examinee had impingement signs with pain and weakness on abduction, external rotation. No gross ligamentous instability noted and there was pain with cross-body adduction.

2

Dr. Pucek then recommended surgical treatment due to failure of conservative treatment.

**REVIEW QUESTION(S):**
**Is the requested Right shoulder arthroscopy with labral debridement versus repair medically necessary?**

No. The requested Right shoulder arthroscopy with labral debridement versus repair is not medically necessary.

In this case, there is not a Type II or specific Type IV lesion described in the MRI report and the physical examination did not document provocative testing indicative of a possible labral tear for which surgical treatment would be medically necessary. Therefore, the requested arthroscopic surgery with labral debridement versus repair is not medically necessary within ODG recommendations.

**Criteria Guidelines Utilized and its Application:**

ODG, Shoulder, Surgery for SLAP lesions, is recommended for Type II lesions and Type IV lesions if more than 50 percent of the tendon is involved after 3 months of failed conservative treatment.

On August 19, 2015, Ms. Dyer returned to Dr. Pucek who noted, verbatim, that, "We had her scheduled [for surgery], but Workmen's Comp's infinite wisdom denied it, believed not medically necessary. She is back today requesting options, so I told her at this point, she failed conservative treatment, there is very little I have to offer if unable to do surgery." (Ex. 1 at 22). Dr. Pucek advised she could either have surgery through her private insurance or "fight it out with Workmen's Comp about coverage." *Id.* Return visits on November 5, 2015, and April 25, 2016, yielded histories of no change in symptoms and continued statements by Dr. Pucek that he had nothing to offer apart from surgery. *Id.* at 24-25; 29. On April 26, 2016, Dr. Pucek corresponded with Ms. Dyer's counsel to reiterate his opinions on failed conservative treatments and his continued surgical recommendation. *Id.* at 32.

On September 27, 2016, the parties deposed Dr. Pucek. When asked if he "agreed" or "disagreed" with Dr. Smith's opinion regarding the type lesion that appeared on the MRI or his opinion that the "physical examination did not document provocative testing indicative of a possible labral tear," Dr. Pucek testified:

I would have to say I disagree. I mean, I've evaluated her four or five times. As far as I know, we threw everything we could non-operatively at her. She

still has persistent symptoms. I think I documented she had a lot of pain in the cross-body adduction or bringing the arm across the body kind of stressing the labrum. I stand by my opinion that at this point there's nothing else to do for this shoulder but scope it.

(Ex. 2 at 17).

Dr. Pucek further testified that the MRI and his physical examination "suggested a labral tear." *Id.* at 18. Namely, "with these type symptoms and the examination we documented, it's going to boil down to rotator cuff or labrum 99 percent of the time, so I felt we dotted the "i's" and crossed the "t's". *Id.* He noted that, "MRI evaluations of labrums are dubious at best, okay, and you never know until you get in there." *Id.* at 24. Further, Dr. Pucek felt that simply viewing the MRI does not allow a physician to "tell specifically acute versus chronic just based on looking at the MRI without all the history and mechanism and stuff." *Id.* at 26.

For her part, Ms. Dyer testified that physical therapy had helped her very little and, that medications, including an injection, "did not help at all." Currently, her shoulder hurts "very bad," though it is "better some days." She seeks help from her husband to "get dishes out of the cabinet," has problems sweeping, and notes cold air, such as a blowing ceiling fan, causes her pain. She noted she is right hand dominant. She would like to undergo the recommended surgery in an attempt to improve her condition.

Ms. Dyer argued that Dr. Pucek's recommendation for surgery is presumed medically necessary pursuant to Tennessee Code Annotated section 50-6-204(A)(3)(H)(2015). Further, "[b]eyond that basic premise, Dr. Pucek provided a detailed analysis of not only his rationale for recommending surgery, but also, for his disagreement with Utilization Review denial. ." T.R. 5 at 5.

Liberty Mutual countered that Dr. Smith's opinion was based on specific MRI findings and followed the treatment guidelines. Accordingly, the Court should give Dr. Smith's opinion more weight than Dr. Pucek's opinion.

### Findings of Fact and Conclusions of Law

*Standard Applied*

Ms. Dyer bears the burden of proof on all prima facie elements of her workers' compensation claim. Tenn. Code Ann. § 50-6-239(c)(6) (2015); *see also Buchanan v. Carlex Glass Co.*, No. 2015-01-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *5 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015). However, Ms. Dyer need not prove every element of her claim by a preponderance of the evidence at an Expedited Hearing stage in order to obtain relief. *McCord v. Advantage Human Resourcing*, No. 2014-06-

4

0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Rather, she must come forward with sufficient evidence from which this court might determine she is likely to prevail at a hearing on the merits. *Id.*; Tenn. Code Ann. § 50-6-239(d)(1)(2015).

*Analysis*

The sole issue for determination is whether Ms. Dyer is entitled to the surgery recommended by Dr. Pucek. Resolution of this issue requires the Court to determine if Liberty Mutual rebutted the applicable presumption of medical necessity attached to Dr. Pucek's recommendation. After review of the evidence, the Court holds that Liberty Mutual has not done so.

A recent Appeals Board case provides guidance. In *Morgan v. Macy's*, No. 2016-08-0270, TN Wrk. Comp. App. Bd. LEXIS 39 (Tenn. Workers' Comp. App. Bd. Aug. 31, 2016), our Appeals Board "consider[ed] the relationship between the newly-adopted medical treatment guidelines and the presumptions outlined in the Workers' Compensation Law. *Id.* at *15. The Board first noted Tennessee Code Annotated section 50-6-204(a)(3)(H) provides a presumption of medical necessity for "any treatment recommended" by an authorized physician. Further, the Board noted section 204(a)(3)(I) provides that, "[f]ollowing the adoption of treatment guidelines . . . the presumption of medical necessity for treatment recommended by an authorized physician is rebuttable only by clear and convincing evidence demonstrating that the recommended treatment substantially deviates from, or presents an unreasonable interpretation of, the treatment guidelines." The Board noted the Bureau adopted medical treatment guidelines effective January 1, 2016. *See,* Tenn. Comp. R. & Regs. 0800-02-25-.03(2)(2016).

Based upon these provisions, the Board held in *Morgan* that, "a trial court can apply one of two potential presumptions to the issue of medical necessity in any given case." *Id.* at *17. First, a trial court should apply a presumption that treatment recommended by an authorized physician is "presumed medically necessary" subject to rebuttal by *a preponderance of the evidence. Id.* at *17; *see, e.g., Walker v. G.UB.MK Constructors*, No. E2015-00346-SC-R3-WC, 2016 Tenn. LEXIS 313 (Tenn. Workers' Comp. Panel May 2, 2016)(Emphasis added). This presumption applies when the treating physician does not explicitly follow the treatment guidelines. Second, a trial court should apply a presumption rebuttable only by *clear and convincing evidence* when the authorized physician "explicitly follows the treatment guidelines" *Id.* at *18.

In this case, there is no evidence that Dr. Pucek "explicitly follow[ed] the treatment guidelines." Thus, under *Morgan*, Liberty Mutual need only rebut the medical necessity of the recommended surgery by a preponderance of the evidence. Our Supreme Court instructs that a preponderance of the evidence standard requires that the truth of the facts asserted be more probable than not. *Teter v. Republic Parking Sys.*, 181 S.W.3d

5

330, 341 (Tenn. 2005). So guided, this Court will analyze the medical evidence.

First, the Court notes the medical records in evidence indicate Dr. Pucek saw Ms. Dyer on multiple occasions. *See generally*, Ex. 1. At each visit, he examined her right shoulder. Based upon his findings, he formulated an opinion that surgery was the only remaining treatment option. Conversely, Dr. Smith, the UR physician only reviewed medical records; he never examined Ms. Dyer. Likewise, there is no indication that Dr. Smith reviewed the actual MRI. Based upon the record review, Dr. Smith opined the recommended surgery was not medically necessary according to the treatment guidelines.

When "faced . . . with conflicting medical testimony," this Court must determine which expert opinion "should be accepted [and which opinion] contains the more probable explanation." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991). Further, this Court should consider "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991). Further, it is reasonable to conclude that the physician "having the greater contact with [the injured worker] would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

The Court finds Dr. Pucek testified he "evaluated [Ms. Dyer] four or five times." (Ex. 2 at 17). The records indicate these evaluations occurred over a period of four months before Dr. Smith's record review for UR purposes. Dr. Pucek documented his findings at each examination before formulating his opinion that surgery is the only viable option for treating Ms. Dyer's shoulder injury. When exercising its obligation to determine which expert opinion to accept, and applying the factors of *Orman*, the Court holds Dr. Pucek's opinion is more accurate.

Second, the Court is guided by the precedent of *Venable v. Superior Essex, Inc.*, No. 2015-05-0582, 2016 TN Wrk. Comp. App. Bd. LEXIS 56 (Tenn. Workers' Comp. App. Bd. Nov. 2, 2016), a recent case of our Appeals Board. In *Venable*, the injured employee sustained a knee injury requiring surgery. When he failed to improve, an authorized physician opined a second surgery was required and stated: "I think the current issue and need for [surgery] are related to his original work comp injury." *Id.* at *2. The physician also explained the anatomic findings supporting his opinion. The employer submitted the request to UR and Dr. Glenn Smith, the same UR physician as in this case, "concluded that the recommended surgery was not medically necessary based on his review of the medical records and his interpretation of the [medical treatment guidelines]" *Id.* at *3. Then, the treating physician refuted Dr. Smith's opinion and the employer again sent the surgery recommendation to UR. A second UR physician opined the surgery was "likely reasonable" but, was not work-related. The Medical Director agreed with the employer's denial. The trial court ordered the employer to provide the

6

requested surgery. *Id.* at *4.

In affirming, the Board found "it was within the scope of the trial court's authority to assess the validity of the utilization review reports and determine the relative weight to be given those physicians' opinions as well as other expert medical opinions." *Id.* at *9. The Board stated:

> In the present case, an authorized physician . . . opined that the recommended surgery was "related to [the employee's] original work comp injury." [The authorized physician] then explained his disagreement with Dr. Smith's utilization review report and stated, "[t]here is clear progression in his radiographic findings comparing today's x-ray with the original x-rays from 9/18/2014." After receipt of the second utilization review report, in which [another UR physician] agreed that the recommended surgery was "likely reasonable" but "unrelated to the injury in question," [the authorized physician] reiterated his opinion that the need for surgery was related to [the injury in question]. We find such evidence was sufficient to support the trial court's determination that Employee is likely to prevail at a hearing on the merits.

*Id.* at *11-12.

Here, Dr. Pucek, like the authorized physician in *Venable*, "explained his disagreement with Dr. Smith's report." Namely, Dr. Pucek disagreed with Dr. Smith's opinions regarding the absence of certain anatomic findings and the absence of "provocative testing indicative of a possible labral tear." (Ex. 1 at 34).

In explaining his disagreement, Dr. Pucek testified MRI studies of the shoulder labrum "are dubious at best" and, oftentimes fail to detect anatomic abnormalities found at the time of surgery. (Ex. 2 at 24). Notably, Dr. Pucek personally reviewed the MRI. *Id.* at 11. Similarly, the treating physician in *Venable* disagreed with the UR physician based upon x-ray findings. Likewise, Dr. Pucek "documented [Ms. Dyer] had a lot of pain in . . . bringing [her] arm across the body kind of stressing the labrum." (Ex. 2 at 17). Hence, his physical examination is at variance with Dr. Smith's statement that "the physical examination did not document provocative testing indicative of a possible labral tear." (Ex. 1 at 34). Accordingly, the Court finds Dr. Pucek offered the more "probable explanation" regarding the issue of the propriety of surgical intervention. *See, Thomas*, 812 S.W.2d at 283.

Further, Dr. Pucek stood by opinion that surgery is the only remaining option and that further conservative therapy is fruitless. This challenges Dr. Smith's opinion that the treatment guidelines require "3 months of failed conservative treatment." (Ex. 1 at 34). Of course, the evidence indicates Dr. Pucek has already tried three months of

7

conservative treatment, beginning in April 2015 and extending through July 2015, all before the UR report. After the UR report, he saw Ms. Dyer in August and November 2015, and noted at both visits the failure of conservative care.

Finally, Tennessee law has long held that medical proof is not to be "read and evaluated in a vacuum" but, instead "must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition." *Thomas*, 812 S.W.2d at 283. The Court finds Ms. Dyer testified credibly regarding her physical condition and limitations. She was steady and, though obviously frustrated by her current predicament, did not overly exaggerate her complaints of pain. Her intonation and demeanor were consistent with one who had endured pain for some time and her expressed desire to obtain relief and a return to gainful employment were believable. In context of Dr. Pucek's recommendations, the Court finds her lay testimony supports the reasonableness of the recommended surgery.

In making these findings, the Court recognizes its inability to "independently assess an injured worker's symptoms as described in the medical records." *Morgan*, at *18, *citing Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *8 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). Thus, it confined its analysis to the "conflicting [and] countervailing evidence properly admitted into the record," namely, the findings and opinions of Dr. Smith juxtaposed against those of Dr. Pucek. *See, Scott*, at *8. After such analysis, the Court holds Liberty Mutual has not rebutted the presumption of medical necessity attached to Dr. Pucek's recommended surgery by a preponderance of the evidence.

**IT IS, THEREFORE, ORDERED** as follows:

1. In accordance with Tennessee Code Annotated section 50-6-204(a)(1)(A)(2015), Liberty Mutual shall continue to pay for reasonable and necessary medical treatment for Ms. Dyer's right shoulder injury of January 12, 2015, including approval of the right shoulder surgery recommended by Dr. Kelly Pucek.

2. **This matter is set for an Scheduling/Status Hearing on February 6, 2017, at 10:30 a.m. Central Time.**

3. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance. For questions regarding compliance, please contact the Workers'

8

Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 10th day of November, 2016.**

_____
**Judge Allen Phillips**
**Court of Workers' Compensation Claims**

Scheduling (Status) Hearing:

An Scheduling/Status Hearing has been set with **Judge Allen Phillips, Court of Workers' Compensation Claims. You must call toll-free at 731-422-5263 or toll free 855-543-5038 to participate in the Initial Hearing.**

**Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation.**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk _within seven business days_ of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice

of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

# APPENDIX

Exhibits:
1. Medical Records, collectively, of Occ Med, Dr. Kelly Pucek, Dr. Glenn Smith (UR Report), and of Bureau's Medical Director; and
2. Deposition of Dr. Kelly Pucek.

Technical record:[2]
1. Petition for Benefit Determination;
2. Dispute Certification Notice;
3. Request for Expedited Hearing; and,
4. Employee's Pre-Hearing Brief.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 10th day of November, 2016.

| Name | Via Email | Service sent to: |
| --- | --- | --- |
| Spencer R. Barnes, Esq., Attorney for Employee | X | spence@morrisonandbarnes.com Chandra@morrisonandbarnes.com |
| Shaterra Reed., Esq., Attorney for Employer | X | Shaterra.reed@libertymutual.com Lesley.burton@libertymutual.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims

---

[2] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.