

**FILED**

**May 29, 2018**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 3:20 P.M.**

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Sheila Owens | ) Docket No. 2017-01-0401 |
| | ) |
| v. | ) State File No. 44323-2015 |
| | ) |
| Sitters, Etc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Audrey A. Headrick, Judge | ) |

---

### Reversed and Remanded – Filed May 29, 2018

---

The employee in this interlocutory appeal sustained injuries while performing her job duties when she caught a patient who was falling. She alleged she injured her shoulder and back and aggravated her pre-existing cervical condition. The employer accepted the shoulder and back injuries as compensable, but denied that the aggravation of the employee's pre-existing cervical condition arose primarily out of the work incident. The trial court determined the employee presented sufficient proof of an aggravation of her pre-existing cervical condition to establish she would likely prevail at trial and ordered the employer to provide medical benefits for the employee's cervical condition. The employer has appealed. We reverse the trial court's determination and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

Alex B. Morrison, Knoxville, Tennessee, for the employer-appellant, Sitters, Etc.

Ronald J. Berke, Chattanooga, Tennessee, for the employee-appellee, Sheila D. Owens

### Factual and Procedural Background

Sheila Owens ("Employee"), a fifty-four year-old nursing assistant employed by Sitters, Etc. ("Employer"), alleges she injured her shoulder, back, and neck while performing her work duties on June 9, 2015. She was assisting an elderly patient stand up from a seated position when the patient slipped, and she caught the patient and "put her in her [wheel]chair." The following day, Employee reported to her supervisor that

she had injured her back and shoulder.[1]  She was instructed to seek care at a walk-in medical clinic.  The medical provider ordered an MRI, and when Employee returned to the clinic she was referred to another medical provider based upon the results of the MRI.

Thereafter, Employee came under the care of two authorized orthopedic surgeons. Dr. Rickey Hutcheson was authorized to treat Employee's back, and Dr. Robert D. Mastey was authorized to treat Employee's shoulder.  Employee told to Dr. Hutcheson on her initial visit that she was injured at work on June 9, 2015, and had been off work since. He diagnosed Employee with a lumbar strain and prescribed medication and physical therapy.  He treated Employee until January 2016, at which time he thought she had reached maximum medical recovery for her lumbar strain.  Although he testified that Employee's pre-existing degenerative disc disease contributed to her symptoms, he stated "most of her symptoms [were] associated with the lumbar strain, which was greater than 51% causally related to work."

Dr. Mastey began treating Employee's shoulder in August 2015.  His August 19, 2015 report reflects that Employee complained of "pain in her right shoulder with radiation down into her arm . . . [and] numbness and tingling of the arm," as well as "neck pain both on the right and left sides, which has worsened since the injury."  The report also noted that he had treated Employee several years before her June 9, 2015 work injury "for severe neck pain and bilateral hand numbness."  Dr. Mastey testified Employee's "shoulder problem is more than 51 percent related to the [work] injury."  He testified he discussed Employee's "neck problem" with her and her "carpal tunnel problems," noting she had a lengthy history of neck problems.  However, he declined to offer an opinion regarding causation with respect to Employee's neck condition because he "wasn't treating her for her neck."  Asked specifically whether he thought the neck complaints were related to the June 2015 work incident, he testified they "could very well be, but, I mean, this neck is such a bad problem it doesn't take much to trigger it off.  I would have to defer that to Dr. Pearce."

During his deposition, Dr. Mastey was questioned repeatedly concerning Employee's pre-existing neck condition and whether he observed anything he would say was advanced by the work injury.  He consistently responded that he was not following her for that condition and did not have an opinion.  He placed Employee at maximum medical improvement for her shoulder condition in December 2017, but acknowledged the date could change in the event she underwent shoulder surgery.  He testified he understood Employee had agreed to undergo another cervical surgery and that he could not determine whether shoulder surgery would be necessary until she recovered from her cervical surgery.

---

[1] Employer accepted Employee's shoulder and back claims as compensable, and no issues related to those injuries are before us.

On March 1, 2016, Employee was seen by Dr. Alexander Roberts, a physical medicine and rehabilitation physician. The report of that visit states she was referred by her primary care physician for "complaints of cervical spine and [bilateral upper extremity] pain with [numbness and tingling] today." The report detailed Employee's prior medical care for her cervical spine, which began in 2000 and included surgeries in 2002, 2004, and 2008, physical therapy in 2012, and a CT scan in 2013. Dr. Roberts recorded Employee's report of a June 9, 2015 work injury, followed by conservative treatment and a referral to him for additional evaluation. Dr. Roberts ordered cervical CT and MRI studies and bilateral upper extremity EMG nerve conduction studies.

Employee returned to Dr. Roberts following completion of the recommended diagnostic studies. The cervical CT scan indicated degenerative disc disease at C3-4 and C5-6, anterior cervical fusion from C5-7 without vertebral screws in the C6 vertebrae, evidence of a fragment of the screw in the C6 vertebrae, and evidence of a fusion at C4-5 with a solid arthrodesis. The MRI revealed degenerative disc disease at C3-4 and C5-6, a disc bulge with an overlapping central disc protrusion at C3-4, and right and left stenosis at C3-4, C5-6, and C7-T1. The EMG nerve conduction study revealed "electrodiagnostic evidence of a right C5 and C6 radiculopathy with active denervation." Based upon these findings, Dr. Roberts referred Employee to Dr. Richard Pearce for a surgical evaluation.

Dr. Pearce first examined Employee on July 14, 2016, at which time he reviewed the diagnostic studies ordered by Dr. Roberts and recommended surgery. He noted in his initial report that he discussed treatment options, including surgery, and that Employee elected to proceed with surgery. Approximately one year later at Employee's next visit with Dr. Pearce, he noted she was "still trying to get [workers' compensation's] approval for surgery but having increased [numbness and tingling]." He recommended another MRI to assess whether she was developing myelomalacia, noting that Employee had some "increased radicular symptoms in the left upper extremity." He reported "she would like to avoid surgery so we will again try to see if there is anything more conservative we can do for her." Employee's attorney sent a letter to Dr. Pearce asking whether the need for the cervical surgery he had recommended in July 2016 was (1) "[c]aused by the new injury," (2) "[c]aused by the old condition being aggravated by the new injury," or (3) "[c]aused by the old injury." Dr. Pearce marked "yes" to the second question, but did not indicate a response to the first or third questions.

In his deposition, Dr. Pearce testified he was able to compare 2013 and 2016 CT scans, and stated the 2016 CT scan showed that the condition of Employee's spine at C3-4 was worse than it had been in 2013. Asked if he had an opinion whether the "condition at C3-4 was caused by her work-related injury in June 2015," he said he would "relate it" to that particular event. He was also asked whether Employee's June 2015 injury made her anatomical findings worse and answered, "[b]ased on the CTs, the area of C3-4 appeared to be worse."

3

On cross-examination, Dr. Pearce agreed that diagnostic studies prior to the June 2015 work incident evidenced anatomic changes in Employee's cervical spine. He said the only pre-injury diagnostic report he had was the CT scan performed in 2013. He was then shown and questioned about an MRI report from 2003, two MRI reports from 2007, two MRI reports from 2008, and an MRI report from 2013. He agreed the reports of the 2003 MRI and a March 2007 MRI did not show significant abnormalities, and that a report of an August 2007 MRI indicated a small disc protrusion at C3-4 without spinal cord deformity, which represented an anatomic change from the earlier MRI reports. He reviewed and was asked about the reports of two 2008 MRIs and stated the differences in the reports may only represent differing interpretations of the radiologists who prepared the reports. However, he agreed that a 2012 MRI report described a disc herniation at C3-4 that was "touching" the spinal cord. When asked whether, having considered the diagnostic reports that pre-dated the June 2015 incident, it was still his opinion that Employee's C3-4 problems were "related" to the June 2015 injury as opposed to a progression of the condition at C3-4 since 2007, Dr. Pearce responded:

> Based on the reports that you have, there was obviously some early anatomic changes, some maybe degenerative changes, some bulging of the discs. Based on the MRI that I reviewed in 2016, the amount of cord compression and the size of that disc herniation was [sic] obviously much worse. And at what point that occurred between the last MRI of 2012 versus 2016 I cannot say except, based on her history, that she started having symptoms, and now we have a new MRI which shows a definite anatomic change.

Dr. Pearce agreed, however, that Employee's disc at C3-4 could have continued to "worsen without pain symptoms." He testified he could not say that the "worsening" occurred on or after the June 2015 incident, but "based on [Employee's] history when the symptoms got worse . . . I have to assume that's when that occurred."

On re-direct, Dr. Pearce testified that spondylolisthesis revealed by the 2016 MRI, which he described as a sign of instability in the spine, was not indicated in the 2012 MRI report. The 2016 MRI also revealed stenosis and a broad-based disc bulge at C3-4 that were not identified in the 2012 MRI report. He was again asked about causation and whether Employee's condition at C3-4 was "proximally" caused by the work injury:

> Q.    And if you consider the history given to you, your examinations, the various testing that I've asked you about that you've discussed and defense counsel has asked you about, along with her entire records and her entire course of treatment, is it still your opinion to a reasonable degree of medical certainty that her condition at C3-C4 was proximally caused by her work-related injury in June 2015?

4

A.      Yes, sir, based on her history.

Q.      And also with the same hypothetical, to a reasonable degree of medical certainty, it is still your opinion that the work-related injury in June 2015 caused a worsening of her anatomical condition at C3-4?

A.      Again, comparing the pre- and post-injury MRIs, there's definitely been an anatomic change. There's no way for me to say that that change occurred on that specific day, but based on her history, there has been worsening.

Q.      If you include her history in the hypothetical –

A.      Then I assume it was made worse on that date.

In December 2016, Employer sought an independent medical evaluation with Dr. Jay E. Jolley, an orthopedic surgeon. Dr. Jolley noted Employee had undergone three cervical spine surgeries. He attributed the condition of Employee's cervical spine to degeneration that he thought did not result from the work injury.

[Employee] does have significant degeneration at C3-C4. This has led to some spinal stenosis, which appears to be non-traumatic and simply acquired. I believe this is causing some radiating arm pain into the right shoulder region. However, this clearly is not traumatic and not from the lifting incident that occurred in June 2015, which does appear to be more related to the history of lumbar sprain and the shoulder strain and possible cuff tear that Dr. Mastey is treating. . . . Again, I do not believe this is from the work injury in June 2015 but rather a degenerative and acquired condition adjacent to the previous fusion at C4-C5.

Dr. Jolley testified that the surgery Dr. Pearce recommended was a reasonable option for Employee, but stated, "I don't see how that would be related directly to the incident of 2015." He testified his assessment was that Employee's "pains in her right arm were due to the stenosis at C3-C4 . . . which would typically be from bone spurs and essentially arthritis." When asked about his diagnoses and whether those conditions were caused by the June 9, 2015 incident, he testified "the lumbar sprain would be related to the 2015 incident," but as to the right partial rotator cuff tear, he stated he "would probably defer" to other experts as he does not consider himself a "shoulder expert." He added that "the cervical issues appear to be chronic and pre-existing."

Dr. Jolley admitted that Employee could have "tweaked her spinal condition" in the June 2015 incident, making it somewhat worse. He was asked on cross-examination about the letter Employee's attorney sent to Dr. Pearce and whether he agreed with Dr.

5

Pearce's response to the second question concerning whether the recommended surgery was "caused by the old condition being aggravated by the new injury." He responded:

> It sounds like she had an uptick in pain following [the June 2015] incident. Again, 'uptick' meaning she had complaints clearly, and rightly so, with her neck prior to the incident. So did that incident that day aggravate her neck and cause her some increased pain? It appears so, yes. . . . But again, at the same time . . . can I sit there and say, you know, the incident is more responsible for her need of surgery? No, I cannot. I would say that her overwhelming degeneration and arthritis at that level is causing her significant pain and is more responsible than the incident.

Dr. Jolley was pressed about the second question on the letter sent to Dr. Pearce and was asked, "[y]es or no, do you agree with Dr. Pearce's statement where he checked it on [number] 2." Dr. Jolley responded, "[y]es."

Following the trial court's review of the records, the court found in Employee's favor and ordered Employer to provide medical benefits for Employee's cervical condition. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

**Analysis**

While Employer has failed to designate any issues for review in its brief as required by Tenn. Comp. R. & Regs. 0800-02-22-.02(2) (2018), we perceive the

determinative issue to be whether the preponderance of the evidence supports the trial court's determination that Employee would likely prevail at trial in establishing she suffered a compensable aggravation of her cervical condition. We conclude it does not.

Generally, to be compensable, an injury must arise primarily out of and in the course and scope of employment and must cause death, disablement, or the need for medical treatment of the employee. Tenn. Code Ann. § 50-6-102(14) (2017). "An injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). Also, "[t]he opinion of the treating physician, selected by the employee from the employer's designated panel of physicians . . . shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence." Tenn. Code Ann. § 50-6-102(14)(E).

An "accidental" injury generally does not include the aggravation of a pre-existing condition "unless it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment." Tenn. Code Ann. § 50-6-102(14)(A). Thus, to establish a compensable aggravation of a pre-existing condition, an employee must prove by a preponderance of the evidence that the employment contributed more than fifty percent in causing the aggravation, considering all causes. Tenn. Code Ann. § 50-6-102(14)(C)-(D). *See also Miller v. Lowe's Home Centers, Inc.*, No. 2015-05-0158, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at \*13 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015) ("[A]n employee can satisfy the burden of proving a compensable aggravation if: (1) there is expert medical proof that the work accident 'contributed more than fifty percent (50%)' in causing the aggravation, and (2) the work accident was the cause of the aggravation 'more likely than not considering all causes.'"). If an employee satisfies the burden of proving a compensable aggravation, the employer must provide medical treatment "made reasonably necessary by [the] accident." Tenn. Code Ann. § 50-6-204(a)(1)(A) (2017).

*The Authorized Physicians' Causation Opinions*

Employee was authorized to treat with Dr. Hutcheson for her back injury and with Dr. Mastey for her shoulder injury. Dr. Hutcheson offered no causation opinion as to Employee's cervical condition. Dr. Mastey testified he had no opinion regarding the cause of Employee's neck complaints because he "wasn't treating her for her neck." When asked if he thought Employee's neck complaints were related to the work injury, he responded that they could be but that he would defer to Dr. Pearce. Similarly, when asked about his opinion as to whether Employee's "neck problems were caused by the old condition being aggravated by the new injury," Dr. Mastey testified "I don't have an opinion. I would have to defer to Dr. Pearce."

7

The trial court concluded that Employee's authorized treating physicians did not render opinions on "causation of her cervical condition," noting specifically that Dr. Mastey deferred to Dr. Pearce on the issue of causation. We agree the authorized treating physicians did not offer opinions addressing the cause of Employee's cervical condition. Accordingly, we conclude there is no statutory presumption of correctness applicable to any causation opinion expressed by the medical experts concerning Employee's cervical condition.

*The Causation Opinions of Dr. Pearce and Dr. Jolley*

When considering the expert opinions addressing the cause of Employee's neck complaints, the trial court was persuaded by Dr. Pearce's testimony, stating that he "testified that the June 9, 2015 injury aggravated [Employee's] pre-existing cervical condition necessitating surgery." However, we do not find the referenced testimony in Dr. Pearce's deposition. Rather, that appears to be Dr. Pearce's opinion based on his response to the letter sent to him by Employee's attorney. Moreover, concluding that "Dr. Jolley, who performed [Employer's] IME, agreed with Dr. Pearce's opinion," the trial court determined that Employee "provided sufficient evidence of her entitlement to medical benefits for her cervical condition and satisfied her burden at this interlocutory stage." We disagree and conclude that the preponderance of the evidence does not support the trial court's determination.

In evaluating expert medical opinions, a trial judge may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts." *Venable v. Superior Essex, Inc.*, No. 2015-05-0582, 2016 TN Wrk. Comp. App. Bd. LEXIS 56, at *6 (Tenn. Workers' Comp. App. Bd. Nov. 2, 2016). "A trial judge has the discretion to conclude that the opinion of one expert should be accepted over that of another expert." *Sanker v Nacarato Trucks, Inc.*, No. 2016-06-0101, 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *11-12 (Tenn. Workers' Comp. App. Bd. July 6, 2016). As stated by the Tennessee Supreme Court, "[w]hen faced . . . with conflicting medical testimony . . ., it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991) (citation omitted) (internal quotation marks omitted). Thus, a trial court's determination regarding the relative weight to be given to expert medical opinions should be affirmed by a reviewing court unless the reviewing court concludes the trial court abused its discretion.

However, in this case the trial court did not accept Dr. Pearce's opinions over those of Dr. Jolley. Rather, the trial court determined that Dr. Jolley agreed with Dr. Pearce's opinion with respect to the cause of the cervical spine condition. While we

disagree with that conclusion, we first address whether Dr. Pearce's opinions alone were sufficient to establish that Employee would likely prevail at trial.

The issue is not whether the surgery recommended by Dr. Pearce is necessary for Employee's worsening cervical condition. Dr. Jolley agreed that the surgical procedure recommended by Dr. Pearce is an appropriate course of care. Rather, the issue is whether the expert medical proof was sufficient for the trial court to determine that Employee would likely prevail at trial in establishing the need for surgery was primarily caused by the work injury. While Dr. Pearce and Dr. Jolley agreed that Employee's condition at C3-4 was significantly worse following the 2015 work incident, Employee must present proof sufficient to meet the statutory requirements of section 50-6-102(14) to prevail.

In his direct examination, Dr. Pearce testified that, based on the diagnostic testing he reviewed, Employee's cervical condition after the June 2015 incident was worse than before the incident. When asked if he had an opinion whether that condition was caused by Employee's work-related injury, he said he would "relate it" to that particular event. He was asked whether Employee's June 2015 injury made her anatomical findings worse, and without having reviewed any MRI reports that pre-dated the work incident he answered, "[b]ased on the CTs, the area of C3-4 appeared to be worse." While it is not necessary for a physician to use particular words or phrases to address causation, *see Panzarella v. Amazon.com, Inc.*, No. 2015-01-0383, 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (Tenn. Workers' Comp App. Bd. May 15, 2017), proof that an injured worker's condition following a work incident is worse than it was on a given date prior to the alleged work accident, or that the injured workers' condition is "related to" a work accident, does not meet the requirements of section 50-6-102(14)(A)-(D).

After Dr. Pearce reviewed the MRI reports that pre-dated Employee's June 2015 work incident, he was asked whether it was still his opinion that Employee's C3-4 problems "are related" to the June 2015 injury rather than being a progression of the condition of Employee's cervical spine at C3-4 after 2007. He responded that "the amount of cord compression" and "the size of the disc herniation" at C3-4 "was obviously much worse" after the incident, and added that "at what point that occurred between the last MRI of 2012 versus 2016 I cannot say except, based on her history, that she started having symptoms, and now we have a new MRI which shows a definite anatomic change." He agreed, however, that Employee's disc at C3-4 could have continued to worsen without being symptomatic and stated he could not say that any worsening occurred on or after the June 2015 incident. Rather, based on Employee's history, he had to "assume" that was when it occurred. Again, proof that the worsening occurred after the date of the work incident falls short of establishing "to a reasonable degree of medical certainty" that the work incident "contributed more than fifty percent (50%) in causing the [aggravation], considering all causes." Tenn. Code Ann. § 50-6-102(14)(A), (B).

Moreover, section 50-6-102(14)(D) defines "[s]hown to a reasonable degree of medical certainty" to mean "that, in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Dr. Pearce did not offer a causation opinion that addressed whether his opinion was "more likely than not considering all causes," or words of similar import.[2]

Having carefully reviewed the medical records, the deposition testimony, and the trial court's order awarding Employee the relief requested, we conclude that Dr. Pearce's records and testimony do not rise to the level required to meet the standards expressed in section 50-6-102(14)(A)-(D) for a compensable aggravation of a pre-existing condition. Additionally, we conclude from our review and consideration of the records and deposition of Dr. Jolley and the other physicians whose records and testimony are included in the record that the preponderance of the evidence does not support the trial court's determination.

### Conclusion

We conclude the expert medical proof preponderates against the trial court's determination that Employee met her burden of establishing a compensable aggravation of her pre-existing cervical condition. We reverse the trial court's decision and remand the case.

---

[2] When asked whether it was his opinion "to a reasonable degree of medical certainty that [Employee's] condition at the C3-4 was *proximally* caused by her work-related injury in June 2015," he responded "[y]es, sir, based on her history." (Emphasis added.) Black's does not define "proximally" and defines "proximate" to mean "[i]mmediately before or after." Black's Law Dictionary (10th ed. 2014). Merriam-Webster defines "proximal" to mean "situated close to" or "next to or nearest the point of attachment or origin." https://www.merriam-webster.com/dictionary/proximal (last visited May 29, 2018). Proof that a medical condition is "proximally caused" by a work incident, standing alone, does not meet the requirements of section 50-6-102(14)(A)-(D).

FILED

May 29, 2018

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 3:20 P.M.



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Sheila Owens | ) | Docket No.  2017-01-0401 |
| | ) | |
| v. | ) | State File No.  44323-2015 |
| | ) | |
| Sitters, Etc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 29th day of May, 2018.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Ronald J. Berke | | | | | X | ronnie@berkeattys.com |
| Alex B. Morrison | | | | | X | abmorrison@mijs.com |
| Audrey A. Headrick, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | Penny.Patterson-Shrum@tn.gov |

Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov