**FILED**
**Apr 28, 2021**
**02:28 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MEMPHIS

| | | |
|---|---|---|
| **FREDERICK RUSSELL,** | ) | **Docket No. 2019-08-0191** |
| **Employee,** | ) | |
| **v.** | ) | |
| **ALUMA FORM, INC.,** | ) | **State File No. 7324 2018** |
| **Employer** | ) | |
| **and** | ) | |
| **AMERICAN COMPENSATION INS. CO.,** | ) | **Judge Amber E. Luttrell** |
| **Carrier.** | ) | |

---

## COMPENSATION ORDER

---

The Court held a Compensation Hearing on Mr. Russell's claim for a shoulder injury. Aluma Form accepted the shoulder sprain but contested a labral tear and impingement diagnosed by an unauthorized physician. The issues are whether Mr. Russell proved causation for these conditions and if so, the amount of permanent partial disability benefits to which he is entitled, and payment of his unauthorized medical bills and temporary disability benefits. For the following reasons, the Court holds Mr. Russell established causation for his shoulder injury and he is entitled to the requested benefits.

### History of Claim

Mr. Russell worked for Aluma Form as an assembly technician. On January 17, 2018, he pulled a basket of heavy parts that was sitting on a rolling cart when the wheel stuck, causing a jerking injury to his left shoulder and neck. He felt severe pain, reported the injury, and requested treatment. After several days, Aluma Form sent him to an occupational injury clinic for initial treatment.[1] Mr. Russell saw a physician, who after three visits ordered MRIs and referred him to an orthopedic specialist.

Aluma Form provided a panel of orthopedic specialty groups, which included Memphis Orthopedic Group. Mr. Russell testified he requested Dr. Christopher Pokabla at Memphis Orthopedic Group and returned the panel to the adjuster. The adjuster, however,

---

[1] Aluma Form questioned Mr. Russell regarding prior medical records, which are not relevant because they did not mention past shoulder treatment.

1

informed him that he could not select a specific physician and must choose a practice group from the panel. The parties introduced the first panel form offered to Mr. Russell, and the employee portion was blank. (Ex. 4.) However, the parties agreed that Mr. Russell chose Dr. Pokabla, and the adjuster declined his selection, as Mr. Russell testified.

Mr. Russell then selected Memphis Orthopedic Group, and Aluma Form authorized treatment with Dr. Riley Jones. (Ex. 5.) Aluma Form also provided two authorized neurosurgical evaluations for Mr. Russell's neck with Dr. John Brophy and pain management with Dr. Matthew Kangas. Mr. Russell later sought unauthorized treatment for his shoulder with Dr. Apurva Dalal, who performed surgery for an anterior labral tear.

*Dr. Jones*

Dr. Jones testified he saw Mr. Russell for treatment five times. At every visit but one, Dr. Jones found a positive O'Brien's test, positive Speed's test, and "grossly intact range of motion with pain" on exam of the shoulder. He explained that a positive O'Brien's test suggests a labral tear, and the positive Speed's test suggests irritation of the bicep tendon. Dr. Jones stated that "grossly intact motion" means Mr. Russell had almost full motion, but "it hurt him to go to extremes." Dr. Jones further noted Mr. Russell was tender to palpation at multiple locations at the shoulder.

Dr. Jones ordered an MRI and an EMG of both upper extremities, which were normal. He treated Mr. Russell conservatively and testified the treatment he provided was causally-related to the work injury.

Dr. Jones additionally treated Mr. Russell's left-sided neck complaints. His working diagnosis for the neck was cervical spondylosis and possible myelopathy. A cervical MRI revealed abnormalities, so Dr. Jones referred Mr. Russell to Dr. Brophy for a neurosurgical evaluation. Dr. Brophy stated abnormalities were not work-related and referred Mr. Russell back to Dr. Jones. Mr. Russell saw Dr. Brophy once more for his cervical complaints, and Dr. Brophy again offered treatment through his personal insurance and stated he could return to work full duty.

Dr. Jones last saw Mr. Russell for treatment on May 23, 2018. Mr. Russell's symptoms had not changed: he still felt parascapular and shoulder pain. Dr. Jones testified he saw no objective findings, and his exam showed nothing other than pain complaints. He then referred Mr. Russell to Dr. Kangas for pain management. He testified that Mr. Russell was "pretty much" at maximum medical improvement at that visit. However, he also stated that he did not discharge Mr. Russell, and he could have returned to see him. Dr. Jones's office note was silent regarding whether he told Mr. Russell he could return.

Based on the referral, Mr. Russell next saw Dr. Kangas for neck pain diagnosed as cervicalgia. Dr. Kangas ordered a medial branch block at C4-C7, which was denied by utilization review. According to Mr. Russell, the case manager informed him of the denial on August 10, 2018. (Ex. 11.) A few days later, Mr. Russell canceled his August 16, 2018

appointment with Dr. Kangas and did not return. Regarding Mr. Russell's work status, Dr. Kangas responded to a questionnaire and stated Mr. Russell could work full duty. (Ex. 13.)

Aluma Form sent Mr. Russell back to Dr. Jones in March 2020 for an impairment evaluation after his treatment with Dr. Dalal detailed below. Dr. Jones rated him based on motion loss. He measured Mr. Russell's active range of motion using a goniometer, took three measurements, and picked the maximum measurement to assign impairment. Dr. Jones calculated Mr. Russell's range-of-motion impairment as 6% to the upper extremity, which converted to 4% to the whole person.

Regarding causation for the labral tear found by Dr. Dalal, Dr. Jones testified that during his treatment, he saw "no clinical or objective findings that Mr. Russell had a rotator cuff tear or labral tear." He further stated, "he had a complaint of pain. It was a sprained shoulder, but there were no indications of any tears," and he found no basis for surgery. However, Dr. Jones acknowledged on cross-examination that he noted in his record both nonsurgical and surgical options for Mr. Russell's shoulder.

Aluma Form's counsel further questioned Dr. Jones regarding Dr. Dalal's post-operative diagnosis of an anterior labral tear and asked whether it was related to the work injury. Dr. Jones stated, "I can't speak to what Dr. Dalal saw. All I can tell you is on our examination and two MRIs which reported there was no evidence of a labral tear." He later testified, "I think what we should have done was probably an MRI arthrogram at that point . . . because that shows up these tears. Labral tears are, you know, weird."

*Dr. Dalal*

Mr. Russell saw Dr. Dalal for additional treatment of his left shoulder several months after seeing Dr. Kangas. Dr. Dalal reviewed Mr. Russell's prior treatment records and testified that the history and symptoms Mr. Russell reported to Drs. Jones, Brophy, and Kangas were consistent with Mr. Russell's complaints to him.

On exam, Dr. Dalal found severely limited range of motion, significant tenderness to palpation, and positive impingement and supraspinatus tests. He stated the supraspinatus test findings suggested Mr. Russell might have a rotator cuff tear or inflammation in the rotator cuff muscles. He ordered an MRI, which was normal. Dr. Dalal diagnosed impingement syndrome with adhesive capsulitis and recommended a shoulder arthroscopy. Dr. Dalal explained to Mr. Russell that "just because the MRI was negative, it doesn't rule it out." He noted that Mr. Russell reported he was not covered by workers' compensation insurance and wanted to proceed with surgery.

Dr. Dalal performed the surgery, which revealed an anterior labral tear. He testified that he was "not surprised that we couldn't see it on MRI." He explained, "MRIs can miss these tears very easily: It was a small tear anteriorly. You've got to put a probe and lift that labrum to actually see the tear." He stated the tear was traumatic and not degenerative. He explained that a "degenerative tear of the labrum is like fraying of the labrum. A traumatic

tear is more like an inversion from the bone." After surgery, Dr. Dalal testified that Mr. Russell's testing was still positive for impingement, which indicated he still had inflammation in the shoulder.

On June 5, 2019, Dr. Dalal placed Mr. Russell at maximum medical improvement. He assigned permanent restrictions and kept Mr. Russell off work from December 27, 2018, through June 5, 2019. Dr. Dalal saw Mr. Russell again for an impairment evaluation and also rated him based on range-of-motion deficits. He calculated a 17% upper-extremity impairment, which he converted to a 10% rating to the whole person.

On cross-examination, Dr. Dalal acknowledged that Mr. Russell's abduction measurement at the evaluation was significantly lower than any pre- or post-operative measurements. Based on this discrepancy, Dr. Dalal reduced his rating for abduction and stated the revised total would be 14% to the upper extremity instead of 17%. However, he gave conflicting testimony as to his adjusted body-as-a-whole rating. He testified that if he used any abduction measurement from a prior visit, the body-as-a-whole rating would be 8%. He later testified his adjusted 14% percent upper-extremity rating converted to a 10% rating to the body.

As for causation, Dr. Dalal testified that the work injury caused Mr. Russell's shoulder problems for which he performed surgery. He further said that, "within a reasonable degree of medical certainty or 80% I can state that a work-related injury caused him to have problems with his left shoulder." Dr. Dalal additionally testified that his treatment, including surgery and the physical therapy, were reasonable and necessary for the injury, and the charges from his office and the Memphis Surgery Center were reasonable and in line with other area providers.

*Additional Hearing Testimony*

Mr. Russell testified that he sought unauthorized treatment because Dr. Jones said at his last visit on May 23, 2018, that he could do nothing else for him, and he referred him to Dr. Kangas. Dr. Jones also never told him he could return.

In addition, Mr. Russell testified that Dr. Brophy told him at a second visit that workers' compensation would not pay for anything else, and he must use his personal insurance. Mr. Russell said the safety manager, Mike Hendrix, called and advised that he would have to see his personal physician or Dr. Kangas on his own insurance because workers' compensation was not paying anything more. After that call, Mr. Russell saw no reason to return to Dr. Kangas and began seeking treatment on his own.[2]

---

[2] Before seeing Dr. Dalal, Mr. Russell testified he first sought treatment with his personal physician, Dr. Dang, and others for his ongoing left-shoulder and neck symptoms. The parties did not introduce those records into evidence: The Court previously granted partial summary judgment to Aluma Form, holding it was not liable for payment of those bills because Mr. Russell offered no proof of the reasonableness or necessity of that treatment.

Mr. Russell stated Aluma Form knew he was treating with Dr. Dalal on his personal insurance from his communications with human resources. When Dr. Dalal released Mr. Russell at maximum medical improvement with permanent restrictions, he contacted a human resources representative about returning to work but was not permitted to do so.[3]

Loretta Carson, the nurse case manager, testified for Aluma Form regarding Dr. Kangas's treatment and her conversations with Mr. Russell regarding his August 16 appointment with this physician. Ms. Carson testified Dr. Kangas ordered a medial branch block for the neck at C4-C7, which Aluma Form submitted to utilization review. She communicated with Mr. Russell in June 2018, to advise him the decision was pending, but the block was ultimately denied in August.

After learning Mr. Russell canceled his August 16 appointment, Ms. Carson attempted to call and email to see if he wanted to reschedule his appointment, but Mr. Russell never responded. Ms. Carson further testified that she did not tell Mr. Russell that he would be responsible for payment of his treatment with Dr. Kangas or that his workers' compensation claim was closed.

### Findings of Fact and Conclusions of Law

At a Compensation Hearing, Mr. Russell must prove by a preponderance of the evidence that he is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2020).

*Causation and Impairment*

To prove a compensable injury, Mr. Russell must show "to a reasonable degree of medical certainty that [the injury] contributed more than fifty percent (50%) in causing the . . . need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). "Reasonable degree of medical certainty" means that, "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(14)(D). Thus, causation generally must be shown by expert medical testimony.

The Court considered the competing medical opinions of Drs. Jones and Dalal, who are both board-certified orthopedic surgeons who treat shoulder injuries. Both are well-qualified to offer opinions on causation and impairment.

Before considering the medical proof, the Court must first address whether Dr. Jones's causation opinion is presumed correct under Tennessee Code Annotated section 50-6-102(14)( E).

---

[3] Mr. Russell's wife, Philisa Russell, accompanied him to his doctors' appointments and corroborated his testimony concerning the panel issue and the decision to seek treatment on his own.

Mr. Russell argued Dr. Jones was not panel-selected, so his opinion should not be presumed correct. The Court agrees. Tennessee Code Annotated section 50-6-204(3)(i) provides, "the employer shall designate a group of three (3) or more independent reputable . . . specialty practice groups[.]" Tennessee Compilation Rules and Regulations 0800-02-01-.06(6) applies when an employer only designates a group of specialty practice groups and states,

> When the name of a specialty practice group, consisting of multiple physicians willing to treat workers' compensation employees, is provided as an option on any panel provided by the employer rather than an individual physician's name and that group is chosen by the employee, the employee will have the final choice as to which appropriate physician from within that group shall become the authorized treating physician.

Here, the proof showed that the adjuster rejected Mr. Russell's choice of Dr. Pokabla at Memphis Orthopedic Group and chose Dr. Jones. Thus, the Court holds Dr. Jones was not a panel-selected physician, and his causation opinion is not presumed correct.

Turning to the medical testimony, Dr. Jones testified inconsistently regarding causation. He testified that Mr. Russell had no shoulder findings to suggest a tear or anything other than pain and a sprain. However, he conceded on cross-examination that he consistently noted positive O'Brien's and Speed's findings, which suggested a labral tear and irritation of the bicep tendon respectively as well as range-of-motion deficits.

Dr. Jones further testified that he did not consider surgery for Mr. Russell; yet, he acknowledged that his records discussed both nonsurgical and surgical options. He did not offer any explanation for the discrepancy, seemed to dismiss his clinical findings as subjective, and reiterated that he found no indication of a tear. Notably, Dr. Jones candidly testified, "what we should have done was probably an MRI arthrogram . . .because that shows up these tears. Labral tears are, you know, weird."

In contrast, Dr. Dalal testified that Mr. Russell's history and shoulder symptoms were consistent with those given to Dr. Jones, and his clinical findings suggested Mr. Russell might have a rotator cuff tear or inflammation in the rotator cuff muscles despite his normal MRI. So, he performed an arthroscopy and found an anterior labral tear that he stated was traumatic based on its presentation. Dr. Dalal was not surprised the tear was not visible on the MRI due to its size and location. He testified that MRIs can easily miss this type of tear and stated, "It was a small tear anteriorly. You've got to put a probe and lift that labrum to actually see the tear." The Court finds Dr. Jones's testimony regarding the MRI arthrogram's ability to show these tears (as opposed to the MRI) supports Dr. Dalal's testimony.

When faced with conflicting medical testimony, the Court must accept one expert opinion over another and, in so doing, may consider which opinion contains the more probable explanation. *Sanker v. Nacarato Trucks, Inc.,* 2016 TN Wrk. Comp. App. Bd.

LEXIS 27, at *12 (July 6, 2016). Further, Tennessee law has long held that medical proof is not to be "read and evaluated in a vacuum" but, instead "must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991). Here, based on the medical proof and Mr. Russell's credible testimony regarding his injury and resulting shoulder symptoms, the Court finds Dr. Dalal offered the more probable and persuasive testimony regarding Mr. Russell's labral injury and need for shoulder treatment. Thus, the Court holds the preponderance of the evidence showed that Mr. Russell sustained a compensable labral injury with impingement.[4]

Turning to impairment, both Dr. Jones and Dr. Dalal rated Mr. Russell based on range-of-motion loss using the AMA Guidelines, Sixth Edition.

Dr. Jones testified he followed the Guides's instructions, and his rating "comes straight out of the book." He measured Mr. Russell's active motion using a goniometer and took three measurements each of Mr. Russell's flexion, extension, abduction, and internal and external rotation. Dr. Jones selected the maximum measurement for each to determine Mr. Russell's impairment and calculated 6% to the upper extremity, which converts to a 4% whole-person impairment.

Dr. Dalal also examined Mr. Russell's range of motion; however, he did not state whether he took three measurements each and used the maximum measurements to determine impairment. Dr. Dalal initially calculated 17% to the upper extremity, which converts to a 10% whole-person impairment. However, during cross-examination, he reduced his upper-extremity rating to 14% given the discrepancies in Mr. Russell's abduction measurements. He stated this converted to an 8% whole-person impairment. However, he later gave conflicting testimony when he stated the reduced 14% upper-extremity impairment would result in 10% impairment to the body.

Considering this testimony, the Court finds Dr. Jones gave a clear, detailed explanation of how he examined Mr. Russell's range of motion and calculated a 4% impairment to the body using the Guides, which was not challenged on cross-examination.

Dr. Dalal's testimony regarding impairment was less clear. On cross-examination, Dr. Dalal conceded that Mr. Russell's abduction measurement was significantly less at his impairment evaluation visit than *any* prior pre- or post-operative visit. Because of these discrepancies, Dr. Dalal reduced his rating to 14% upper-extremity impairment. However, he then gave conflicting testimony regarding the proper body-as-a-whole rating for a 14% upper-extremity rating. Based on the physicians' testimony, the Court gives greater weight to Dr. Jones's impairment opinion and holds Mr. Russell sustained a 4% impairment to the body as a whole.

---

[4] Had the Court held that Dr. Jones's causation opinion was presumed correct, Mr. Russell overcame that presumption based on the above findings.

*Permanent Partial Disability*

The Court next turns to Mr. Russell' entitlement to permanent partial disability benefits. The assessment of these benefits occurs at two different times.

The first assessment takes place once the treating physician places the injured employee at maximum medical improvement and assigns an impairment rating. Based on the above findings for Mr. Russell's shoulder, the Court finds he has an anatomic rating of 4% to the body, which entitles him to eighteen weeks of benefits. At his stipulated compensation rate of $407.39, Mr. Russell's original award is $7,333.02. *See* Tenn. Code Ann. § 50-6-207(3)(A).

The second assessment occurs at the expiration of the initial compensation period. Based on the 4% rating and the maximum medical improvement date of June 5, 2019, Mr. Russell's initial compensation period expired on October 9, 2019. At that time, the parties did not dispute that he had permanent restrictions and had not returned to work for any employer; therefore, he qualifies for a resulting award and increased benefits. *See* Tenn. Code Ann. § 50-6-207(3)(B). The parties stipulated that if Mr. Russell qualified for increased benefits, the multipliers of 1.35 for no return to work and 1.2 for his age apply.

The Court holds Mr. Russell is entitled to increased benefits. Applying those multipliers, his increased benefits total $4,546.47 for a combined permanent partial disability award totaling $11,879.49.

*Dr. Dalal's medical expenses*

Aluma Form argued it is not liable for Mr. Russell's unauthorized medical expenses with Dr. Dalal because Mr. Russell was not justified in seeking unauthorized treatment.

The Workers' Compensation Appeals Board has held that an employer risks being required to pay for unauthorized treatment if it does not provide treatment made reasonably necessary by the work injury under Tennessee Code Annotated section 50-6-204(a)(1)(A). However, the employer must first be given an opportunity to provide the treatment, and "[w]hether an employee is justified in seeking additional medical services to be paid for by the employer without consulting the employer depends on the circumstances of each case." *Hackney v. Integrity Staffing Solutions,* 2016 TN Wrk. Comp. App. Bd. LEXIS 29, at *8-9 (July 22, 2016) (internal citations omitted). Further, an "employee [should] do no less than to consult [the] employer before incurring expenses called for by the statute if the employee expects the employer to pay for them." *Id.* at *9.

Aluma Form argued that Dr. Jones testified that Mr. Russell could have returned to him. It further pointed to Ms. Carson's testimony that Mr. Russell canceled his August 16 appointment with Dr. Kangas and did not respond to her attempts to reach him to reschedule. He also did not discuss the decision with the adjuster or field case manager.

8

In response, Mr. and Mrs. Russell both testified that Dr. Jones advised them at his last visit of May 23 that he had nothing more to offer Mr. Russell when he referred him to Dr. Kangas. Dr. Jones even testified he considered Mr. Russell "pretty much at MMI" when he last saw him on May 23. They further testified that Dr. Brophy advised Mr. Russell that workers' compensation would not pay for his treatment and he would have to use his personal insurance, which was consistent with Dr. Brophy's records. As for Dr. Kangas's treatment, the proof shows Mr. Russell was notified shortly before his August 16 appointment that the medial branch block was denied. Although Mr. Russell admitted he canceled the appointment, he explained he did so because his safety manager called him and said to use his personal insurance going forward because workers' compensation was not paying anymore. The safety manager did not testify at trial; thus, Mr. Russell's testimony regarding that call was uncontroverted.

Upon thorough consideration, the Court credits the testimony of Mr. and Mrs. Russell. Dr. Jones's own testimony—that he found nothing objective on shoulder exam, Mr. Russell had a sprain, and Mr. Russell was "pretty much" at MMI at his last visit—supports their testimony. Based on this finding and Mr. Russell's uncontroverted testimony that the safety manager advised him workers' compensation was not paying anything more, the Court finds Mr. Russell was justified in seeking unauthorized treatment. Further, Dr. Dalal testified his treatment, including surgery and physical therapy, and the charges were reasonable and necessary for the work injury. Thus, the Court holds Aluma Form is liable for the medical expenses incurred for Dr. Dalal's treatment.

*Temporary Total Disability*

Finally, as for Mr. Russell's request for temporary disability benefits, he must show (1) he became disabled from working due to a compensable injury, (2) a causal connection between that injury and his inability to work, and (3) the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Dec. 11, 2015).

Mr. Russell requested temporary disability benefits beginning August 16, 2018, when he stopped treating with Dr. Kangas, through June 5, 2019, when Dr. Dalal placed him at maximum medical improvement. The proof showed Dr. Kangas stated in a questionnaire that Mr. Russell could return to work full duty. Thus, the proof is insufficient to support an award of temporary disability from August 16 through December 27, 2018. However, Dr. Dalal testified he took Mr. Russell off work for his shoulder injury from December 27, 2018, through June 5, 2019, a period of 22.85 weeks. Therefore, Mr. Russell is entitled to temporary disability benefits in the amount of $9,308.86 for that period.

**IT IS THEREFORE, ORDERED** as follows:

1. Aluma Form or its carrier shall pay permanent partial disability benefits to Mr. Russell in the amount of $11,879.49.

2. Aluma Form or its carrier shall pay temporary disability benefits to Mr. Russell in the amount of $9,308.86.

3. Aluma-Form or its carrier shall satisfy Mr. Russell's medical bills from Tri-State Orthopedics (Dr. Dalal) and Memphis Surgery Center attached as Exhibit 3.

4. Mr. Russell shall receive future medical benefits for his shoulder injury under Tennessee Code Annotated section 50-6-204. Dr. Dalal is designated as his authorized treating physician.

5. Mr. Russell's counsel is entitled to a twenty-percent attorney's fee to be paid from his award. *See* Tenn. Code Ann. § 50-6-226(a)(1).

6. Costs of $150.00 are assessed against Aluma-Form under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (August, 2019), to be paid within five days of this order becoming final.

7. Aluma-Form shall file a statistical data form (SD2) within ten business days of the date of this order under Tennessee Code Annotated § 50-6-244.

8. Unless appealed, this order shall become final thirty days after issuance.

**ENTERED** April 28, 2021.


*Amber E. Luttrell*
**JUDGE AMBER E. LUTTRELL**
Court of Workers' Compensation Claims

*Appendix*

Exhibits

1. Employer's Medical Records Index
2. Deposition of Dr. Riley Jones
3. Deposition of Dr. Apurva Dalal[5]
4. First Panel of Physicians

---

[5] Mr. Russell attached extensive records as exhibits to Dr. Dalal's deposition, which were duplicates of records included in the employer's index made Exhibit 1 or were not properly indexed under the Court's rules. By agreement, the Court removed exhibits 7 and 8 from Dr. Dalal's deposition, as they were duplicates. Further, the Court allowed Mr. Russell to late-file a medical records index of Dr. Dalal's records, which were substituted as exhibit 6 to Dr. Dalal's deposition.

10

5. Second Panel of Physicians
6. 2013 Baptist Healthcare record
7. 2015 Baptist Healthcare record
8. 2016 Baptist Healthcare record
9. Dr. Shah record
10. Text message between Mr. Russell and Mordenia Littlejohn
11. Excerpt of Mr. Russell's treatment diary
12. Mr. Russell's August 10, 2018 handwritten diary entry
13. Questionnaire to Dr. Kangas
14. Email from Loretta Carson to Mr. Russell

Technical Record

1. Petitions for Benefit Determination
2. Dispute Certification Notice
3. Scheduling Order (Oct. 8, 2019)
4. Order Granting Employer's Motion to Continue ADR and Compensation Hearing
5. Order Resetting Scheduling Hearing
6. Amended Scheduling Order (Nov. 18, 2020)
7. Order on Employer's Motion to Deem Correspondence as Authentic and Admissible
8. Employer's Pre-Compensation Hearing Brief
9. Order on Summary Judgment Denying in Part and Granting in Part
10. Employee's Witness and Exhibit List
11. Order Granting Employer's Motion to Allow Rebuttal Witness Testimony by Telephone
12. Employer's Objection to Employee's Exhibit List and Motion to Exclude Medical Records
13. Order on Employer's Objection to Employee's Exhibit List
14. Dispute Certification Notice (post-discovery)
15. Pre-Trial Conference Order and Order Resetting Trial
16. Employer's Pre-Compensation Hearing Statement

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on April 28, 2021.

| Name | Email | Service sent to: |
|---|---|---|
| Christopher L. Taylor, Employee's Attorney | X | ctaylor@taylortoon.com sreynolds@taylortoon.com |
| Richard Scott McCullough, Employer's Attorney | X | smccullough@mbbslaw.com |

_Penny Shrum_

Penny Shrum, Court Clerk
Court of Workers' Compensation Claims